**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

WACHOVIA SECURITIES, L.L.C., a
Delaware limited liability company,

Plaintiff,

vs.

DONNA STANTON, an individual

Defendant.

No. C 08-4058-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING PLAINTIFF'S
MOTION FOR A TEMPORARY
RESTRAINING ORDER AND
EXPEDITED DISCOVERY**

―――――――――――

**TABLE OF CONTENTS**

*I.  INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   *A.  Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
      *1.    The parties and their relationship* . . . . . . . . . . . . . . . . . . . 4
      *2.    Stanton's resignation and new employment* . . . . . . . . . . 14
      *3.    Stanton's post-employment conduct* . . . . . . . . . . . . . . . 15
   *B.  Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*II.  LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
   *A.  Standards For A Temporary Restraining Order* . . . . . . . . . . . . . 26
   *B.  Application Of The Standards* . . . . . . . . . . . . . . . . . . . . . . . 29
      *1.    Likelihood of success* . . . . . . . . . . . . . . . . . . . . . . . . 29
         *a.    Breach of restrictive covenants* . . . . . . . . . . . . . . 32
            *i.    Arguments of the parties* . . . . . . . . . . . . . . . 32
            *ii.    Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . 33
         *b.    Misappropriation of trade secrets* . . . . . . . . . . . . 44
            *i.    Arguments of the parties* . . . . . . . . . . . . . . . 44
            *ii.    Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . 46
      *2.    Threat of irreparable harm* . . . . . . . . . . . . . . . . . . . . 49
         *a.    Arguments of the parties* . . . . . . . . . . . . . . . . . . 50

   *b.*  *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
  **3.**  **Balance of harms** . . . . . . . . . . . . . . . . . . . . . . . . . 54
   *a.*  *Arguments of the parties* . . . . . . . . . . . . . . . . . . . 55
   *b.*  *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
  **4.**  **The public interest** . . . . . . . . . . . . . . . . . . . . . . . 56
 **C.** **Expedited Discovery** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

**III.** **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

In this action, filed on July 30, 2008, a securities broker-dealer seeks a temporary restraining order and a preliminary injunction to restrain a former employee from allegedly pirating confidential client information and other employees for the benefit of her new employer, a competing securities firm, pending disposition of arbitration proceedings on the parties' dispute before the Financial Industry Regulatory Authority (FINRA). The broker-dealer also seeks expedited discovery to aid in the disposition of the broker-dealer's motion for a preliminary injunction. Following a hearing on August 4, 2008, in which counsel for both parties participated, but no evidence or witnesses were presented, the court enters this order on the broker-dealer's request for a temporary restraining order and expedited discovery.

# I.  INTRODUCTION

## A.  Factual Background

In a Complaint (docket no. 2), filed July 30, 2008, plaintiff Wachovia Securities, L.L.C., (Wachovia) seeks a temporary restraining order and a preliminary injunction against a former employee, defendant Donna Stanton, pending disposition of arbitration proceedings between the parties concerning various kinds of alleged misconduct by Stanton.  Because of the preliminary nature of the proceedings, the factual background stated here is necessarily based primarily on the allegations in and documents in support of Wachovia's July 30, 2008, Complaint (docket no. 2), Wachovia's July 31, 2008, Motion For A Temporary Restraining Order And Preliminary Injunction And For An Order Permitting Expedited Discovery (docket no. 3), and Stanton's Opposition to Wachovia's Motion For A Temporary Restraining Order (docket no. 10).  In making any findings of fact in this ruling, the court is mindful of the general rule that "the findings of fact and conclusions of law made by a court granting a preliminary injunction [or temporary restraining order] are not binding at trial on the merits."  *University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S. Ct. 1830, 68 L. Ed. 2d 175 (1981); *accord United States Sec. and Exchange Comm'n v. Zahareas*, 272 F.3d 1102, 1105 (8th Cir. 2001) ("[W]e have long held that 'findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding.'") (quoting *Patterson v. Masem*, 774 F.2d 251, 254 (8th Cir. 1985)); *National Credit Union Admin. Bd. v. Johnson,* 133 F.3d 1097, 1103 n. 5 (8th Cir. 1998) (quoting this principle from *Camenisch*); *Henderson v. Bodine Aluminum, Inc.,* 70 F.3d 958, 962 (8th Cir. 1995) (citing this statement from *Camenisch* as the "general rule" for findings of fact and conclusions of law in preliminary injunction rulings).  Thus, all findings of fact in this ruling are provisional.

## 1. *The parties and their relationship*

Wachovia Securities, L.L.C., (Wachovia) is a corporation organized under the laws of the state of Delaware with its principal place of business in St. Louis, Missouri.[1] Wachovia is a securities broker-dealer and a member of the Financial Industry Regulatory Authority (FINRA),[2] the New York Stock Exchange, Inc., and all other major exchanges. Wachovia provides broker-dealer services to individual and institutional clients throughout the United States. In October 2007, Wachovia and A.G. Edwards & Sons, Inc., (Edwards) another securities broker-dealer, completed a merger. Thus, Wachovia alleges that it is a successor in interest to Edwards, which Stanton does not dispute. Wachovia has a branch office in Storm Lake, Iowa, which was formerly an Edwards office.

Defendant Donna Stanton had been employed at the Storm Lake office for Edwards, then Wachovia, for approximately twenty years as of July 2008. Wachovia alleges that Stanton was employed, first, as a "sales assistant" or "financial associate" for Edwards, then as a "registered sales assistant" for Wachovia. Wachovia contends that Stanton was responsible for providing a full range of administrative support services to Wachovia

---

[1]Wachovia is wholly owned by Wachovia Securities Financial Holdings, L.L.C., which is also a corporation organized under the laws of the state of Delaware with its principal place of business in St. Louis, Missouri.

[2]Wachovia represents that FINRA was created in July 2007 through the consolidation of the National Association of Securities Dealers, Inc., (NASD) and the member regulation, enforcement, and arbitration functions of the New York Stock Exchange. Wachovia also contends that, as a registered financial associate with Wachovia, Stanton executed a Form U-4 Uniform Application for Securities Industry Registration or Transfer, and that by executing such a Form U-4, Stanton agreed to submit to arbitration any disputes, claims, and controversies arising between herself and Wachovia. The Form U-4 executed by Stanton is not in the record at this time. Nevertheless, Stanton nowhere contests Wachovia's right to seek arbitration of their dispute.

financial consultants in the Storm Lake office. There were two such financial consultants, or "senior brokers," in the Storm Lake office, who had combined assets under management of approximately $100 million. Wachovia contends that these assets generated more than $500,000 in combined revenue on an annualized basis. More specifically, Wachovia alleges that Stanton was the sales assistant to senior broker Tom McClinton. McClinton managed in excess of $40 million in assets for more than 300 of Wachovia's clients. Tom McClinton retired on July 18, 2008. Since McClinton's retirement, his clients have been reassigned to Alan Bowles, another Wachovia broker in the Storm Lake office. Wachovia alleges that, in addition to assisting McClinton with his clients, Stanton also had a small "book" of her own clients.

In a Declaration submitted in support of her Opposition, Stanton paints a quite different picture of her role at Wachovia. Although she concedes that she was originally hired by Edwards in 1988 as an unregistered sales assistant, she contends that, in 1996, she was asked to get her securities licenses. She contends that, at that time, she was told to sign the Sales Assistant Agreement (the 1996 Agreement), portions of which are set out below. She contends that she was not given new employment in consideration for signing the 1996 Agreement, but only materials to help her study for her licensing examinations. Wachovia alleges that, in consideration for entering into an employment relationship with Edwards (and its successor Wachovia) and executing her employment agreement, Stanton was provided with significant benefits, including fair compensation, office facilities, health insurance, securities registration, and participation in Wachovia's 401(k) plan. The record does not support a finding that Stanton entered into new employment with Edwards or that her continued employment was contingent on executing the 1996 Agreement, but the Agreement does, by its terms, as quoted below, identify adequate consideration for the Agreement. Stanton asserts that, to her knowledge, no other Edwards employees in the

Storm Lake office were required to sign a non-solicitation agreement. She also argues that the 1996 Agreement is inapplicable to her ultimate position as a financial consultant.

Stanton represents that, over the twelve years after becoming registered, she personally originated, developed, and serviced approximately 200 clients under her own production number and that she received 100% of the commissions for such customers. She contends that many of her customers were developed through friends and acquaintances of her prior customers, her personal network of friends and relations, and her personal reputation. Thus, she contends that she developed these customers largely independent of any marketing efforts by Edwards or Wachovia. Stanton concedes that she did assist Tom McClinton with servicing of approximately 100 to 150 of his clients, but she asserts that she and McClinton, who was semi-retired for the last three years that he worked for Edwards, split the commissions under a joint production number, and that she also provided full service to his clients, including research and recommendations, when he was out of the office, often for extended periods of time.

In a Declaration filed in support of Stanton's Opposition, McClinton confirms Stanton's description of her involvement with his clients and their commissions arrangement, adding that Stanton received 3% of his gross commissions, as well. Stanton asserts that she also provided service to the clients of other financial consultants in the office, including Alan Bowles. Stanton asserts that she considered herself and her clients considered her a financial consultant. She also asserts that Alan Bowles was the only person in the office who did not treat her as a peer, and that she believed that Bowles discriminated against her because of her gender—although she offers virtually no factual allegations to support this allegation.

6

On or about March 3, 1996, Stanton entered into the 1996 Agreement with Edwards. Complaint, Declaration of Joseph Wood, Exhibit B. The court finds the following paragraphs of that agreement to be significant to the present dispute:

> In consideration of such acceptance and employment, you agree that:
>
> 1. So long as you serve as an employee of Edwards, you will act only in Edwards' best interest. For that purpose, you will perform your work competently and diligently; and you will observe all directions given by officials of Edwards, all policies announced by Edwards, all regulations and procedures prescribed in Edwards' Policy and Procedures Manuals and Compliance Manuals as from time to time are altered or issued, and all applicable rules of regulatory authorities. You will conduct yourself as a loyal and faithful employee of Edwards, and you will in no event take any action which could harm Edwards' business or its relationships with its clients.
>
> 2. ALL RECORDS AND DOCUMENTS CONCERNING THE BUSINESS AND AFFAIRS OF EDWARDS (INCLUDING WITHOUT LIMITATION THE NAMES, ADDRESSES, TELEPHONE NUMBERS AND ASSETS AND OBLIGATIONS CARRIED IN THE ACCOUNTS OF ITS CUSTOMERS, AND THE BOOKS, PAPERS, RECORDS AND RECORDINGS FURNISHED TO YOU DURING THE TRAINING PROGRAM AND THE RIGHT TO USE SUCH RECORDS, DOCUMENTS, BOOKS, PAPERS AND RECORDINGS ARE, AND SHALL ALWAYS BE, THE CONFIDENTIAL AND EXCLUSIVE PROPERTY OF EDWARDS. YOUR USE OF SUCH RECORDS AND DOCUMENTS, WHETHER GENERATED AND PREPARED BY YOU OR

FURNISHED TO YOU BY EDWARDS, AS PERMITTED BY EDWARDS SHALL CEASE IMMEDIATELY UPON THE FIRST OF THE FOLLOWING EVENTS TO OCCUR: YOUR (1) RESIGNATION, (2) RETIREMENT, (3) RELEASE, (4) DISCHARGE, (5) ACCEPTANCE OF OTHER EMPLOYMENT, OR (6) TERMINATION OF EMPLOYMENT FOR ANY OTHER REASON.

YOU (A) SHALL NOT REMOVE ANY SUCH RECORDS OR DOCUMENTS FROM THE PREMISES OF EDWARDS IN EITHER ORIGINAL, DUPLICATE OR COPIED FORM, EXCEPT IN THE ORDINARY COURSE OF CONDUCTING BUSINESS FOR, AND SUBJECT TO THE APPROVAL BY, EDWARDS AND (B) SHALL IMMEDIATELY DELIVER TO EDWARDS, PRIOR TO THE TERMINATION OF EMPLOYMENT, OR AT ANY OTHER TIME UPON EDWARDS' REQUEST, ANY SUCH RECORDS AND DOCUMENTS IN THE EMPLOYEE'S POSSESSION OR CONTROL.

YOU SHALL NOT (A) DISCLOSE TO ANY PERSON, FIRM, ASSOCIATION, PARTNERSHIP, CORPORATION OR OTHER ENTITY, THE CONTENTS, IN WHOLE OR IN PART, OF SUCH RECORDS AND DOCUMENTS, EXCEPT IN THE ORDINARY COURSE OF CONDUCTING BUSINESS FOR EDWARDS; (B) DIRECTLY OR INDIRECTLY SOLICIT OR AID IN THE SOLICITATION ON BEHALF OF ANY OTHER ORGANIZATION, ANY CUSTOMERS HAVING ACCOUNTS WITH EDWARDS WITH WHOM YOU SHALL HAVE HAD ANY DEALINGS WHATSOEVER DURING THE TERM OF YOUR EMPLOYMENT WITH EDWARDS WHEN SUCH OTHER ORGANIZATION DOES BUSINESS IN SECURITIES, COMMODITIES AND

FINANCIAL FUTURES, INSURANCE OR OTHER LINES OF BUSINESS IN WHICH EDWARDS OR ANY OF ITS AFFILIATES IS ENGAGED; AND/OR (C) RECRUIT, ENTICE, INDUCE OR SOLICIT, DIRECTLY OR INDIRECTLY, ANY EMPLOYEE OF EDWARDS OR ANY OF ITS AFFILIATES FOR EMPLOYMENT WITH ANY OTHER ORGANIZATION WHICH DOES BUSINESS IN SECURITIES, COMMODITIES AND FINANCIAL FUTURES, INSURANCE OR ANY OTHER LINES OF BUSINESS IN WHICH EDWARDS OR ANY OF ITS AFFILIATES IS ENGAGED.

IN THE EVENT YOU BREACH ANY OF THE COVENANTS CONTAINED IN THIS PARAGRAPH, YOU ACKNOWLEDGE THAT EDWARDS' REMEDIES AT LAW FOR DAMAGES WILL BE INADEQUATE AND THAT EDWARDS SHALL BE ENTITLED TO INJUNCTIVE RELIEF TO PREVENT YOUR PROSPECTIVE OR CONTINUING BREACH OF THESE PROVISIONS.    THIS PROVISION SHALL NOT BE CONSTRUED IN ANY WAY TO CONSTITUTE A WAIVER BY EDWARDS OF ANY AVAILABLE REMEDY AT LAW.

\* \* \*

Termination

\* \* \*

26.    In the event that your employment with Edwards ends at any time either through termination by Edwards or through resignation by you, you will surrender all training materials, account records, customers' statements and customers' files to Edwards, and you agree, in such event, that such termination or

> resignation, as the case may be, will constitute the
> forfeiture by you of your right to receive any
> commission on transactions effected, insurance business
> placed or plan payments made subsequent to the date of
> such termination or resignation.

Complaint, Declaration of Joseph Wood, Exhibit B, 1996 Agreement, ¶¶ 1-2, 26
(capitalization and underlining in the original). The 1996 Agreement also provides as
follows:

Miscellaneous

> 30.   The terms of your employment and these standard
>       provisions will enure to the benefit of, and be binding
>       upon, both you and Edwards and our respective
>       successors and assigns. This agreement shall be
>       governed by and construed in accordance with the laws
>       of the State of Missouri even though you are not, or
>       cease to be, a resident or employee of that state.

Complaint, Declaration of Joseph Wood, Exhibit B, 1996 Agreement, ¶ 30 (underlining
in the original). Thus, the court finds that the 1996 Agreement is binding upon and
enforceable by Wachovia as Edwards's successor.

Stanton argues that the 1996 Agreement was inapplicable to her later position as a
financial consultant. The court notes, however, that Stanton entered into the 1996
Agreement at the time that she was asked to obtain her securities licenses and, apparently,
as a prerequisite to receiving materials from Edwards to assist her preparations to take the
licensing examinations. Wachovia disputes that Stanton's position ever changed from
"registered sales assistant" to "financial consultant," and Stanton argues only that she
considered herself to be and that her clients considered her to be a financial consultant, not
that her position or job title actually changed. No party has identified any provision of the
1996 Agreement that would have caused it to terminate because of a change in Stanton's

duties, nor has any party produced a subsequent agreement superseding or terminating the 1996 Agreement or identifying Stanton's position as a "financial consultant rather than a "registered sales assistant." Nevertheless, Stanton's evidence does considerably undermine Wachovia's contention that she only provided administrative support services to Wachovia financial consultants in the Storm Lake office.

Stanton contended, and Wachovia conceded, at the hearing on August 4, 2008, that the "financial consultants" in the Storm Lake office were not subject to non-solicitation agreements similar to the 1996 Agreement. Indeed, Wachovia's counsel represented that neither Edwards nor Wachovia required such a non-solicitation agreement for "financial consultants." When asked by the court to opine on the rationale for imposing such an agreement on sales assistants, but not financial consultants, counsel for Wachovia suggested that the reason is that sales assistants do not have their own clients, but instead service the clients of "financial consultants." Thus, the clients do not "belong" to sales assistants, while they "belong" to "financial consultants," and sales assistants can, therefore, legitimately be precluded from soliciting clients that were not "theirs."

Wachovia alleges, and the court finds, that Stanton was also bound by Edwards's confidentiality policy, as set forth in Section 9.2 of Edwards's Sales Practice Manual, which was made available to all of Edwards's employees. Complaint, Declaration of Joseph Wood, Exhibit C. That policy provides as follows:

> 9.2  Confidentiality of Client Account Information
>
> Client account confidentiality is a very serious matter that all employees should observe at all times. You should never discuss information regarding a client's transactions or account status with other employees, persons not authorized to transact business in the account (spouse, parent or child), or government or regulatory authorities.

Complaint, Declaration of Joseph Wood, Exhibit C.

Wachovia also alleges, and the court finds, that Stanton certified that she had read and understood Edwards's Code of Ethical Conduct.  Complaint, Declaration of Joseph Wood, Exhibit D.  That Code provided, in pertinent part, as follows:

> CONFIDENTIALITY
>
> Directors, officers and employees are obligated to maintain the confidentiality of information entrusted to them by A.G. Edwards, its vendors and/or other employees.  Directors, officers and employees must further abide by A.G. Edwards' Privacy Policy as it pertains to the handling of nonpublic, client information and must maintain the confidentiality of information concerning other employees that they receive in performing their jobs.  Exceptions to the nondisclosure of such information must be authorized by A.G. Edwards' management or mandated by legal or regulatory entities.
>
> No A.G. Edwards representative may provide nonpublic information to persons or organizations outside A.G. Edwards, including the media, unless authorized to do so.  Should an A.G. Edwards representative receive an inquiry from the media, that inquiry should be referred immediately to the Public Relations Group in Corporate Communications.  Any inquiry concerning A.G. Edwards' securities should be referred immediately to Investor Relations. . . .
>
> These restrictions regarding confidentiality apply to confidential information received by employees or officers prior to their employment with A.G. Edwards and continue after their employment with A.G. Edwards ends.

Complaint, Declaration of Joseph Wood, Exhibit D.

As part of her official duties at Wachovia, Stanton had access to extensive personal records and information about Wachovia's clients and personnel records of the financial

consultants in the Storm Lake office. The client records included client identity information, such as social security numbers, addresses, telephone numbers, and also transactional histories, tax information, personal financial data, insurance and banking information, and investment objectives. The information concerning consultants included compensation details and performance reviews. Wachovia has invested substantial corporate resources in the development and maintenance of client information, often over a number of years, and at great expense. Indeed, Wachovia alleges, and the court finds, that its customer list is the "lifeblood" of its business. Wachovia contends, and the court finds, that some of the expenses incurred by Wachovia in obtaining clients are the costs of national and local advertising, training of Wachovia's sales force, support staff, clearing services, operations personnel, systems and support, management and compliance supervision, salaries, annual registration fees, computer services and equipment, phone, mail, research, literature, seminars, trade and other professional news publications, promotional events, retention of experts, and other expenditures to maintain goodwill in the securities industry. Wachovia alleges, and the court finds, that some client information, such as transactional histories, tax information, personal financial data, insurance and banking information, and investment objectives, is not publicly available, is proprietary and valuable, and would be especially useful to a competitor, and that a customer list, even to the extent that it includes publicly accessible information, such as addresses and telephone numbers, is a compilation that is not itself publicly available, is proprietary and valuable, and would be especially useful to a competitor.

Moreover, customer information such as transactional histories, tax information, personal financial data, insurance and banking information, and investment objectives, was also entrusted to Wachovia by its customers with the expectation that it would remain confidential and would not be disclosed to third parties. Applicable laws also required

Wachovia to safeguard this information until such time as controlling authorities authorize its release. Wachovia also alleges, and the court finds, that Stanton had access to information such as customer lists and customers' transactional histories, tax information, personal financial data, insurance and banking information, and investment objectives solely by virtue of her employment with Wachovia and that Stanton was also obligated to maintain the confidentiality of such information pursuant to the contract, policy, and ethical provisions quoted above. Wachovia had in place internal policies and procedures, including the contracts and policies quoted above, that the court finds were reasonably designed to maintain the confidentiality of client information and records, such as customer lists, transactional histories, tax information, personal financial data, insurance and banking information, and investment objectives.

### 2. *Stanton's resignation and new employment*

Stanton resigned from her position with Wachovia, without notice, by letter dated July 11, 2008, but not seen by Wachovia until July 14, 2008. Stanton's resignation came just shortly before the retirement of Tom McClinton, the senior broker whose clients Stanton had helped to service and with whom she had split commissions. Although Wachovia asserts that Stanton's resignation was "abrupt," Stanton asserts that she had become increasingly unhappy after Edwards merged with Wachovia because of changes in business practices and increasing sexual harassment and sexual discrimination to which she was subjected by Alan Bowles. Thus, she contends that, by July 2008, she had determined that staying at Wachovia was not a viable option. She also asserts that it is common practice in the securities industry to resign without notice.

The body of Stanton's July 11, 2008, resignation letter, in its entirety, runs as follows:

The purpose of this letter is to announce my resignation from A.G. Edwards/Wachovia Securities, effective July 13, 2008.

This was not an easy decision to make, on my part. The past 20 years have been very rewarding. I have enjoyed working for A.G. Edwards.

I have accepted a position as an Independent Investment Executive with Century Securities Associates, Inc., a subsidiary of Stifel Financial Corp. This opportunity gives me the chance to grow professionally and continue to work with my clients, in the manner to which they have become accustomed, while offering the same products.

I wish you and Wachovia Securities all the best.

Complaint, Alan Bowles Declaration, Exhibit A.

Immediately after her resignation, Stanton began employment with the brand new Storm Lake office of Century Securities Associates, Inc., (CSA), a subsidiary of Stifel Financial Corporation, a direct competitor of Wachovia. Neither Stifel nor CSA had an office in Storm Lake, Iowa, or in the surrounding area prior to July 2008. CSA's new office is in a building that is still under construction, some eight or ten blocks from Wachovia's Storm Lake office.

3. *Stanton's post-employment conduct*

Wachovia alleges that, following her resignation, Stanton began to solicit Wachovia's clients. More specifically, Wachovia alleges that it has heard from numerous clients, most of whom had been serviced by McClinton, that Stanton has solicited them to move with her to CSA. In support of these allegations, Wachovia offers copies of two letters purportedly sent to Wachovia clients.

The first letter, dated July 14, 2008, to a specific client of Wachovia, is on CSA letterhead and is signed by Stanton. The body of the letter, in its entirety, runs as follows:

> I am pleased to announce that I have joined Century Securities Associates, Inc. as an independent securities professional, effective July 14, 2008. I will continue to provide you with the same services as in the past. Century Securities is a wholly owned broker-dealer subsidiary of Stifel Financial Corp. Stifel, Nicolaus & Company, Incorporated will provide clearing services on your account. An exclusive relationship between Stifel and Century allows us to benefit from the vast resources and experience of Stifel Nicolaus. Century and I will provide you with the personal service and investment counseling you need.
>
> As the clearing firm, Stifel Nicolaus is generally responsible for bookkeeping and safekeeping functions, including receipt and disbursement of all funds and securities. In addition, Stifel Nicolaus regulates and approves margin loans or other extensions of confirmations and statements [sic].
>
> If you have any questions or concerns, you may call me at [telephone numbers deleted].
>
> Stifel Nicolaus, Century Securities, and I thank you for the continued opportunity to be of service and look forward to a long and rewarding relationship.

Complaint, Alan Bowles Declaration, Exhibit B. The record presented so far does not indicate whether this particular recipient or any recipient of a similar letter was one of Stanton's "book" of clients, a client of McClinton's that she had helped service, or a client of McClinton or another Wachovia financial consultant that Stanton had never served.

A second letter offered by Wachovia, dated July 18, 2008, is also on CSA letterhead, but is without a specific addressee. The letter is signed by Stanton and Deb

McAtee. McAtee had also been employed by Wachovia in its Storm Lake office as a sales assistant and receptionist. Wachovia alleges that, on July 14, 2008, McAtee purportedly started a two-week "vacation," but then sent Wachovia a resignation letter dated July 27, 2008, which Wachovia received on July 28, 2008. Thus, under Wachovia's version of events, McAtee signed the July 18, 2008, letter on CSA letterhead before she resigned from her employment with Wachovia. Wachovia alleges that Stanton improperly solicited McAtee to join her at CSA's new office in Storm Lake. Stanton contends, however, that she and McAtee were long-time friends, that McAtee had been as unhappy as Stanton was with changes in the office after Edwards merged with Wachovia, and that McAtee told her that if she left, McAtee wanted to join her. Indeed, Stanton contends that McAtee resigned afer she learned that the locks of the Storm Lake office had been changed and that she had not been issued a new key. Stanton contends that McAtee then asked her for a job, and that Stanton hired McAtee only after McAtee had resigned from her job at Edwards.

The July 18, 2008, letter from Stanton and McAtee runs as follows:

> Greetings,
>
> By now, you have learned of Tom McClinton's retirement. What you may not know is that I too left Wachovia. I have gone to work for another brokerage firm, Century Securities, a division of Stifel Nicolaus, a St. Louis based company. Deb McAtee, who worked with us at Wachovia for the last 4 years will also be joining me. At Century, we are able to offer all the products and services you are accustomed to.
>
> We are located in a new location just south of the Post Office, at 423 Cayuga St., Storm Lake, Iowa. We are able to work with you and provide the same great service you are used to.
>
> We still have some contractors working here and invite you to stop by to check their progress and have a cup of coffee with

> us, or give us a call. We are happy to discuss any questions
> and concerns you may have. We look forward to working
> with you again.

Complaint, Alan Bowles Declaration, Exhibit C. Again, the record presented so far does not indicate how many of Wachovia's clients have received this letter or if the recipients were only in Stanton's own "book," clients that Stanton had jointly serviced with McClinton, or clients of Wachovia that Stanton had never serviced for herself, McClinton, or another financial consultant.

Wachovia alleges that Stanton used Wachovia's confidential and proprietary customer lists and other trade secret information to conduct what Wachovia describes as a "mass mailing" of these letters to clients, almost all of whom were McClinton's clients prior to his retirement. Indeed, Wachovia alleges that, considering the number of clients involved, it is unlikely that Stanton could send all of Wachovia's clients previously serviced by McClinton a letter without improperly taking Wachovia's confidential information. Wachovia also alleges that Stanton has been calling Wachovia's clients previously serviced by McClinton to solicit their business and to convince them to move their accounts from Wachovia to Stanton at CSA.

Stanton represents, however, that she did not take any trade secrets or, indeed, any information from Wachovia. More specifically, in her Declaration, Stanton represents as follows:

> 16. Wachovia's allegation that I have misappropriated its confidential information and trade secrets is entirely false. While I disagree with the assertion that publicly available customer contact information, such as name, address and phone number could possibly be a trade secret, the fact is that I did not remove from Wachovia *any* customer information and have not used or disclosed any such information.

18

17. Further, since I do not have any customer information from Wachovia in my possession, there is no possible threat that I will use or disclose any such information in the future.

\* \* \*

23. As is standard procedure in the industry, after leaving Wachovia, I contacted as many of my customers as I could remember to advise them of my new place of employment.

24. I also sent a letter to Mr. McClinton's customers to advise them of my new place of employment. Other than that letter to Mr. McClinton's customers, I have not initiated any further contact with them. I have responded to those customers, when they have reached out to me.

25. I used only publicly available information that I looked up to contact customers.

Opposition, Stanton Declaration, ¶¶ 16-17, 23-25 (emphasis in the original). Stanton also asserts that her clients have a right to know where she can be reached and to make informed decisions about where to place their accounts.

In his Declaration, McClinton avers that, in connection with his retirement, he advised his clients that they could pursue one of three courses: (1) leave their money with Wachovia to be managed by the new financial consultant assigned to them (Alan Bowles); (2) invest their money with Stanton at her own, independent CSA office in town; or (3) move their money to any other brokerage firm in town. McClinton avers that many of his clients have told him that they were happy to receive a contact letter from Stanton.

Stanton also asserts that, notwithstanding the 1996 Agreement, Edwards had a long-standing policy and practice, indeed, a firm culture, of recognizing that the client relationship is owned by the financial advisor, not the firm, allowing departing financial consultants to take their clients' information and records with them, and allowing former financial consultants to solicit their clients to join them at their new employer, so long as

they wait until after departing to make such a solicitation. She contends that this policy and culture were confirmed by statements of Edwards's chief executive officers, both before and after the merger with Wachovia was announced. *See* Opposition, Exhibits A and C. She also contends that when she and Alan Bowles joined Edwards's then-new office in Storm Lake, they had both left Piper Jaffray, they both brought to Edwards records concerning their clients at Piper Jaffray, and they immediately sent those clients mailings advising them of their new place of employment and asking them to transfer their accounts to Edwards.

McClinton also avers in his Declaration that it had always been the policy at Edwards and Wachovia that the client relationship belongs to the financial consultant, not the firm. He adds that, in his twenty-five years of experience in the securities industry, it is standard procedure for registered representatives who have changed firms to send out solicitation letters to clients they serviced at their former firm. Moreover, McClinton avers that, in his eighteen years with Edwards and Wachovia, he has seen several registered representatives change firms and then openly solicit their customers to join their new firms. Indeed, McClinton avers that he had never seen Edwards or Wachovia take legal action against any registered representative for such conduct prior to this action against Stanton. McClinton avers, further, that over 90% of his clients at the time that he retired had actually moved with him when he left Edward Jones in 1990 and joined Edwards.

Stanton also points out that both Edwards and Wachovia (but not CSA or Stifel) are signatories to the Protocol For Broker Recruiting, which is attached to her Opposition as Exhibit B. The Protocol provides, in pertinent part, as follows:

> The principal goal of the following protocol is to further
> the clients' interests of privacy and freedom of choice in

connection with the movement of their Registered Representatives ("RRs") between firms. If departing RRs and their new firm follow this protocol, neither the departing RR nor the firm that he or she joins would have any monetary or other liability to the firm that the RR left by reason of the RR taking the information identified below or the solicitation of the clients serviced by the RR at his or her prior firm, provided, however, that this protocol does not bar or otherwise affect the ability of the prior firm to bring an action against the new firm for "raiding." The signatories to this protocol agree to implement and adhere to it in good faith.

When RRs move from one firm to another and both firms are signatories to this protocol, they may take only the following account information: client name, address, phone number, email address, and account title of the clients that they serviced while at the firm ("the Client Information") and are prohibited from taking any other documents or information. Resignations will be in writing delivered to local branch management and shall include a copy of the Client Information that the RR is taking with him or her. The RR list delivered to the branch also shall include the account numbers for the clients serviced by the RR. The local branch management will send the information to the firm's back office. In the event that the firm does not agree with the RR's list of clients, the RR will nonetheless be deemed in compliance with this protocol so long as the RR exercised good faith in assembling the list and substantially complied with the requirement that only Client Information related to clients he or she serviced while at the firm be taken with him or her.

* * *

RRs that comply with this protocol would be free to solicit customers that they serviced while at their former firms, but only after they have joined their new firms. A firm would continue to be free to enforce whatever contractual, statutory

> or common law restrictions exist on the solicitation of
> customers to move their accounts by a departing RR before he
> or she has left the firm.

Opposition, Exhibit B (underlining in the original). Stanton contends that, although she did not know of this Protocol at the time that she resigned from Wachovia, she did not choose her new employer on the basis of whether or not her new employer was a party to the Protocol, and she did not provide Wachovia with a list of the information that she was taking with her, her supposed "solicitation" conduct was actually more conservative than the conduct that the Protocol would have permitted, because she did not take any client information from Wachovia.

Wachovia alleges that, unless Stanton's conduct in soliciting clients and employees of Wachovia is immediately restrained, Wachovia's other financial consultants and financial associates will be encouraged to engage in similar conduct, which would be highly disruptive to Wachovia's ability to conduct business in a stable manner or to maintain its goodwill with its customers and employees. Wachovia also alleges that, unless Stanton's conduct in soliciting clients and employees of Wachovia is immediately restrained, other competitors of Wachovia will also be encouraged to engage in the same kind of behavior, which will cause Wachovia severe and permanent damage. Wachovia also alleges that, by soliciting Wachovia's clients, Stanton has caused and will continue to cause irreparable injury to Wachovia that cannot be cured by monetary damages, including the following: (1) loss of personnel and harm to the Storm Lake office; (2) injury to Wachovia's reputation and goodwill in Iowa; (3) present economic loss, which cannot be ascertained at this time, and future economic loss, which could potentially be incalculable; (4) disclosure of trade secrets, customer and employee lists, and other proprietary and

confidential business and customer information; and (5) loss of the confidence and trust of Wachovia's clients and employees and loss of business reputation.

## B. Procedural Background

On July 30, 2008, Wachovia filed its Complaint (docket no. 2) in this matter seeking a temporary restraining order and a preliminary injunction against Stanton, pending disposition of arbitration proceedings between the parties before the Financial Industry Regulatory Authority (FINRA) concerning various kinds of alleged misconduct by Stanton.[3] More specifically, Wachovia alleges that Stanton's misconduct constitutes (1) breach of her employment contract; (2) misappropriation of trade secrets in violation of the Iowa Uniform Trade Secrets Act, IOWA CODE CH. 550; (3) breach of fiduciary duty; (4) breach of duty of loyalty; (5) intentional interference with actual and prospective economic advantage; (6) negligent interference with actual and prospective economic advantage; (7) conversion; and (8) unfair competition.

Wachovia requests judgment as follows:

(A) entry of a temporary and preliminary injunction lasting until such time as FINRA Dispute Resolution renders an award in the underlying dispute, enjoining and restraining Stanton, directly or indirectly, and whether alone or in concert with others, including any director, officer, agent, employee, and/or representative of her new employer, from the following:

(1) soliciting or otherwise initiating any further contact or communication with any client of Wachovia whom Stanton served or whose name became known

---

[3]Wachovia asserts, and Stanton does not dispute, that an arbitration in this matter is proper pursuant to Rule 13804 of the Code of Arbitration Procedures for the FINRA.

to her while in the employ of Wachovia, including but not limited to communicating with such clients for the purpose of advising them of Stanton's new affiliation with her new employer or for the purpose of inviting, encouraging, or requesting the transfer of any accounts from Wachovia;

(2)(a) soliciting the employment of any Wachovia employee or broker, (b) hiring any Wachovia employee or broker, (c) inducing any Wachovia employee or broker to leave the employ of Wachovia, and (d) taking any action to assist her new employer or any other entity employing Stanton from soliciting, inducing, or hiring any employee or broker to leave Wachovia; and

(3) using, disclosing, or transmitting for any purpose any confidential or proprietary information belonging to or concerning Wachovia, its customers or employees, including but not limited to the (a) names, addresses, social security numbers, phone numbers, financial information, investment objectives, and account information of Wachovia's clients, (b) the names, salaries, production, and other business information regarding Wachovia's brokers and employees, and (c) other confidential information, trade secrets, and commercially sensitive materials of Wachovia;

(B) ordering Stanton, and all those acting in concert with her, including but not limited to the directors, officers, employees, and agents of CSA and Stifel, to return to Wachovia all records, documents, and/or information in whatever form (whether original, copied, computerized, or handwritten), pertaining to Wachovia's customers, employees, and business, and purge all documents and information derived therefrom from the possession, custody, and control of Stanton; and

(C) granting such other and further relief as the Court deems just and proper.

24

On July 31, 2008, the day after filing its Complaint, Wachovia filed its Motion For A Temporary Restraining Order And Preliminary Injunction And For An Order Permitting Expedited Discovery (docket no. 3). By order (docket no. 5) dated July 31, 2008, the court found that an expedited hearing should be set on Wachovia's request for a temporary restraining order and expedited discovery to aid in the disposition of the motion for a preliminary injunction. Therefore, the court set a hearing on Wachovia's request for temporary restraining order and expedited discovery for August 4, 2008. The court also directed counsel for Wachovia to serve a copy of the order setting the hearing upon Stanton, to provide a copy to any known counsel for Stanton, and to file proof of such service prior to the hearing.

Although Wachovia did not file proof of service of the hearing order before the hearing, it is nevertheless clear that Stanton and her counsel received timely notice of the hearing, because her counsel contacted the court on August 1, 2008, to make certain arrangements for the hearing, she filed an extensive resistance to Wachovia's motion, and her counsel (both local and out-of-state) appeared for the hearing on August 4, 2008. Indeed, on August 3, 2008, Stanton filed her Brief In Opposition To Plaintiff's Motion For A Temporary Restraining Order And For A Preliminary Injunction (docket no. 10), which was accompanied by various declarations and exhibits.

At the hearing on August 4, 2008, plaintiff Wachovia was represented by Jordan D. Becker of Paduano & Weintraub, L.L.P., in New York, New York, who argued the motion, and by local counsel Daniel B. Shuck of the Heidman Law Firm in Sioux City, Iowa. Defendant Stanton was represented by Andrew J. Shapren of Buchanan, Ingersoll & Rooney, P.C., in Philadelphia, Pennsylvania, who appeared by telephone and argued the motion on Stanton's behalf, and by local counsel Rodney D. Vellinga of Corbett, Anderson, Corbett & Vellinga in Sioux City, Iowa. Neither party called any witnesses or

offered any evidence in addition to the declarations and exhibits filed in their moving and resisting papers. Despite the short time between the filing of the motion and the hearing, counsel for both parties were extremely well prepared and the arguments were particularly thorough, informative, and well presented.

Wachovia's requests for a temporary restraining order and expedited discovery are now fully submitted.[4]

## II. LEGAL ANALYSIS

### A. Standards For A Temporary Restraining Order

As this court has explained in past cases, it is well-settled in this circuit that applications for preliminary injunctions and temporary restraining orders are generally measured against the same factors, which were set forth in the seminal decision in *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (*en banc*). *See Interbake Foods, L.L.C. v. Tomasiello*, 461 F. Supp. 2d 943, 954-55 (N.D. Iowa 2006); *McLeodUSA Telecommc'ns Servs., Inc. v. Qwest Corp.*, 361 F. Supp. 2d 912, 918 (N.D. Iowa 2005); *Doctor John's, Inc. v. City of Sioux City, Iowa*, 305 F. Supp. 2d 1022, 1033-34 (N.D. Iowa 2004); *Branstad v. Glickman*, 118 F. Supp. 2d 925, 937 (N.D. Iowa 2000); *Uncle B's Bakery, Inc. v. O'Rourke*, 920 F. Supp. 1405, 1411 (N.D. Iowa 1996); *accord Straights and Gays for Equality v. Osseo Area Sch. Dist.*, 471 F.3d 908, 911 (8th Cir. 2006) (same factors); *Lankford v. Sherman*, 451 F.3d 496, 503 (8th Cir. 2006) (same factors). Nevertheless, the court must consider, at least briefly, whether any injunctive relief it may grant at this time in this case is a temporary restraining order or a preliminary injunction.

---

[4] Again, this order does not address Wachovia's request for a preliminary injunction.

In both *McLeodUSA* and *Branstad,* this court discussed in some detail the differences between a temporary restraining order and a preliminary injunction. *See McLeodUSA*, 361 F. Supp. 2d at 918 n.1; *Branstad,* 118 F. Supp. 2d at 935-937. Suffice it to say that, in those cases, the court found that the following factors should be considered to distinguish a TRO from a preliminary injunction: (1) whether the hearing was *ex parte* or adversarial; (2) whether the adversarial hearing allowed the basis for the relief requested to be strongly challenged; (3) whether the order expired, by its own terms, within the ten days provided by Rule 65(b); and (4) the "substance" of the order. *Id.*; *Branstad*, 118 F. Supp. 2d at 935-37. In this case, the court held an "adversarial" rather than an *ex parte* hearing with the parties, because the court is reluctant to grant even a temporary restraining order *ex parte*. Nevertheless, the court did not hold the sort of "adversarial hearing," including presentation of evidence beyond the affidavits and exhibits filed with Wachovia's Complaint and Motion and Stanton's Opposition, that would have allowed the basis for the requested order to be "strongly challenged," such that it would be "'particularly unjustified'" to classify the resulting order as a temporary restraining order. *See id.* (quoting *Branstad*, 118 F. Supp. 2d at 936, in turn quoting *Sampson v. Murray,* 415 U.S. 61, 87 (1974)). Moreover, the court has every intention that, if injunctive relief is granted at this time, such relief will expire in ten days, unless within that time, good cause is shown for extending it for a like period, and that a more complete evidentiary hearing on Wachovia's motion for a preliminary injunction will follow in due course, whatever the court's disposition of the motion for a temporary restraining order. *Id.* (citing Fed. R. Civ. P. 65(b)). Finally, the "substance" of this order is intended to be a ruling on a request for a temporary restraining order, rather than a ruling on a motion for a preliminary injunction, not least because of the expedited nature of the proceedings and ruling and the limited nature of any relief that will be granted. *Id.* (citing *Baker Elec.*

*Coop. v. Chaske,* 28 F.3d 1466, 1472 (8th Cir. 1994)).  Therefore, if this order grants injunctive relief, that relief will be a temporary restraining order, not a preliminary injunction. *Id.*

The so-called "*Dataphase* factors" that courts must weigh to decide whether or not to grant a temporary restraining order or preliminary injunction are the following:  (1) the movant's probability or likelihood of success on the merits, (2) the threat of irreparable harm or injury to the movant absent the injunction, (3) the balance between the harm to the movant and the harm that the injunction's issuance would inflict on other interested parties, and (4) the public interest. *Dataphase,* 640 F.2d at 114; *accord Interbake Foods, L.L.C.*, 461 F. Supp. 2d at 955; *Doctor John's, Inc.,* 305 F. Supp. 2d at 1033; *Branstad I,* 118 F. Supp. 2d at 937 (quoting similar factors from *Entergy, Ark., Inc. v. Nebraska,* 210 F.3d 887, 898 (8th Cir. 2000)); FED. R. CIV. P. 65(b)(1).  The burden is on the movant to establish that injunctive relief is appropriate. *Lankford*, 451 F.3d at 503; *Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir. 1994); *Modern Computer Sys., Inc., v. Modern Banking Sys., Inc.*, 871 F.2d 734, 737 (8th Cir. 1989) (*en banc*).  "'No single [*Dataphase*] factor in itself is dispositive; in each case all of the factors must be considered to determine whether on balance they weigh towards granting the injunction.'" *Baker Elec. Co-op.*, 28 F.3d at 1472 (quoting *Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.*, 815 F.2d 500, 503 (8th Cir. 1987) (citing *Dataphase*)); *accord Lankford*, 451 F.3d at 503 ("No single factor is dispositive, as the district court must balance all factors to determine whether the injunction should issue.") (citing *Baker Elec. Co-op.*); *Bandag, Inc. v. Jack's Tire & Oil, Inc.,* 190 F.3d 924, 926 (8th Cir. 1999) ("These factors are not a rigid formula.").  "'A district court has broad discretion when ruling on requests for preliminary injunctions, and [the appellate court] will reverse only for clearly erroneous factual determinations, an error of law, or an abuse of that discretion.'" *Entergy, Ark.,*

*Inc.,* 210 F.3d at 898 (quoting *United Indus. Corp,* 140 F.3d at 1179); *accord Lankford,* 451 F.3d at 503.  This court assumes that it has the same discretion in deciding whether or not to grant a temporary restraining order.  The court abuses its discretion "where the district court rests its conclusion on clearly erroneous factual findings or erroneous legal conclusions." *Lankford,* 451 F.3d at 503-04.

## B. Application Of The Standards

As a matter of completeness, the court will consider, at least briefly, each of the four "*Dataphase* factors." *See Lankford,* 451 F.3d at 503 ("No single factor is dispositive, as the district court must balance all factors to determine whether the injunction should issue.") (citing *Baker Elec. Co-op.*, 28 F.3d at 1472).  Indeed, Stanton challenges Wachovia's showing on each and every factor.

### 1. Likelihood of success

The first "*Dataphase* factor" that courts must consider when ruling on an application for a temporary restraining order or preliminary injunction is the likelihood or probability of success on the merits.  *Dataphase,* 640 F.2d at 114.  Likelihood of success on the merits requires that the movant find support for its position in governing law.  *See, e.g., Baker Elec. Co-op.*, 28 F.3d at 1473-74 (Indian tribe's sovereignty to regulate electrical services); *ILQ Inv., Inc. v. City of Rochester,* 25 F.3d 1413, 1416 (8th Cir. 1994) (first amendment and prior restraint of expression); *City of Timber Lake v. Cheyenne River Sioux Tribe,* 10 F.3d 554, 556-58 (8th Cir. 1993) (Indian tribe's regulatory authority and authority of states to regulate activities on tribal lands); *Aziz v. Moore,* 8 F.3d 13, 15 (8th Cir. 1993) (denial of injunctive relief was proper because federal courts "must abstain from imposing injunctions on prison officials [in an action under 42 U.S.C. § 1983 action] 'in the absence of a concrete showing of a valid claim and constitutionally mandated

directives for relief,'" quoting *Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th Cir. 1982)). As the Eighth Circuit Court of Appeals has explained,

> [A]t the early stage of a preliminary injunction motion, the speculative nature of this particular ['likelihood of success'] inquiry militates against any wooden or mathematical application of the test. Instead, a court should flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined.

*United Indus. Corp. v. Clorox Co.,* 140 F.3d 1175, 1179 (8th Cir. 1998) (internal citations and quotation marks omitted). Thus, the court is not deciding whether the movant for a preliminary injunction or a temporary restraining order will ultimately win. *Heather K. v. City of Mallard,* 887 F. Supp. 1249, 1258 (citing *Glenwood Bridge, Inc. v. City of Minneapolis,* 940 F.2d 367, 371 (8th Cir. 1991)).

In this case, therefore, the court must determine whether there is support for Wachovia's position that Stanton has engaged in misconduct by soliciting Wachovia's clients and employees to join her at CSA. *See, e.g., Baker Elec. Co-op.*, 28 F.3d at 1473-74 (likelihood of success on the merits requires that the movant find support for its position in governing law). In its motion for a temporary restraining order, Wachovia argues that it is likely to succeed on its claims that the restrictive covenants in Stanton's employment contract are valid and enforceable and that Stanton has breached them by soliciting Wachovia's clients and employees. Wachovia also argues that it is likely to succeed on its claim that Stanton has misappropriated trade secrets. The "governing law" as to Wachovia's breach-of-contract claim is, according to the 1996 Agreement, Missouri law. *See* Complaint, Declaration of Joseph Wood, Exhibit B, 1996 Agreement, ¶ 30. Wachovia asserts, and Stanton does not dispute, that the result will be the same, whether

the court applies Missouri law or finds that Iowa law is applicable, notwithstanding the choice-of-law provision in the 1996 Agreement, pursuant to Iowa's choice-of-law and conflict-of-laws rules. The court will apply both Missouri and Iowa law to the breach-of-contract claim, and determine which law applies only if the application of one state's law would yield a different result from application of the other state's law.[5] Only Iowa law

---

[5]The court has confronted the often knotty problem of what law applies to specific common-law and statutory claims in a diversity action a number of times in recent years. *See John Morrell & Co. v. Halbur,* 476 F. Supp. 2d 1061, 1074-75 (N.D. Iowa 2007); *Jones ex rel. Jones v. Winnebago Indus. Inc.,* 460 F. Supp. 2d 953, 963-72 (N.D. Iowa 2006); *Jones Distrib. Co., Inc. v. White Consol. Indus., Inc.,* 943 F. Supp. 1445, 1458 (N.D. Iowa 1996); *Harlan Feeders, Inc. v. Grand Labs., Inc.,* 881 F. Supp. 1400 (N.D. Iowa 1995); *Curtis 1000 v. Youngblade,* 878 F. Supp. 1224, 1251-54 (N.D. Iowa 1995). To resolve the issue of which state's law applies to Wachovia's breach-of-contract claim, the court looks to the conflict-of-laws or choice-of-law rules of the state of Iowa, because in an action based upon diversity of citizenship jurisdiction, a federal district court must apply the substantive law of the state in which it sits, including its conflict-of-laws or choice-of-law rules. *Harlan Feeders, Inc.,* 881 F. Supp. at 1403-04 (citing, *inter alia, Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S. Ct. 1020, 85 L.Ed. 1477 (1941)); *accord Colonial Ins. Co. of Cal. v. Spirco Envtl., Inc.,* 137 F.3d 560, 561-62 (8th Cir. 1998) ("'Federal district courts must apply the choice-of-law rules of the state in which they sit when jurisdiction is based on diversity of citizenship.'") (quoting *Whirlpool Corp. v. Ritter,* 929 F.2d 1318, 1320 (8th Cir. 1991)); *Penney v. Praxair, Inc.,* 116 F.3d 330, 333 n. 4 (8th Cir. 1997) ("Sitting in diversity, a district court is bound to apply the choice of law rules of the state in which it sits . . . ."). However, before any choice of law need be made, there must be a "true conflict" between the laws of the possible jurisdictions on the pertinent issue. *Id.* at 1404; *accord Phillips v. Marist Soc'y of Wash. Province,* 80 F.3d 274, 276 (8th Cir. 1996) (agreeing with the statement of Judge Richard A. Posner that "'before entangling itself in messy issues of conflict of laws a court ought to satisfy itself that there actually is a difference between the relevant laws of the different states.' *Barron v. Ford Motor Co. of Canada, Ltd.,* 965 F.2d 195, 197 (7th Cir. 1992), *cert. denied,* 506 U.S. 1001, 113 S. Ct. 605, 121 L. Ed. 2d 541 (1992)," and simply applying the law of the forum where there was no true conflict).

is applicable to Wachovia's trade secrets argument, however, specifically, the Iowa Uniform Trade Secrets Act, IOWA CODE CH. 550.

### a. *Breach of restrictive covenants*

*i. Arguments of the parties*. Wachovia argues that Stanton used confidential information held by Wachovia to solicit Wachovia's clients to cease doing business with Wachovia and, instead, to do business with CSA and also solicited Wachovia employees to leave Wachovia and join a direct competitor in violation of restrictive covenants in the 1996 Agreement. Wachovia also argues that such restrictive covenants are enforceable under Iowa (or Missouri) law. More specifically, Wachovia argues that the covenants are reasonably necessary, because an employer has a legitimate interest in protecting its existing clients or client base and Wachovia has devoted considerable effort and expense to building, and maintaining the confidentiality of, its client lists and client data. Wachovia also argues that the covenants are not unreasonably restrictive on Stanton, because they do not prevent her from earning a living in the financial services industry, even in the same small town and with a rival company, they just prevent her from soliciting Wachovia's clients and employees in order to do so. Wachovia also argues that enforcement of the restrictive covenants will not prejudice the public interest, because there is no public interest in permitting piracy of Wachovia's hard-earned customer information, especially where Stanton would not be in a position to contact the customers in question but for her unauthorized access to Wachovia's proprietary customer information. By the same token, Wachovia argues that the public interest is served by preserving the confidentiality of and thwarting the misuse of its client information.

Stanton argues, first, that the 1996 Agreement is inapplicable to her in her ultimate position as a financial consultant. She also argues that the restrictive covenants in the 1996 Agreement are unenforceable, because they are not reasonably necessary to protect

32

Wachovia where, pursuant to the Protocol For Broker Recruiting, and the policies and practices of Wachovia (and Edwards), Wachovia (and Edwards) acknowledged that the client relationship belongs to the financial consultant, not the firm, that departing financial consultants can take some client information with them, and that, after departing, financial consultants can solicit their clients to join them at their new firms. Next, Stanton contends that the restrictions on her rights are excessive, because the covenants include no time limit at all and would deprive her of the right to contact clients that she developed largely independent of Wachovia's assistance. She also argues that the covenants are not in the public interest, because they restrict customers' rights to choose their financial consultant. Even if the covenants in question are enforceable, Stanton argues that she has not breached them by improperly soliciting any Wachovia customer or employee to leave, because she has not used any protected information to contact her clients, and it is generally permissible for employees of a firm to agree among themselves, while still employed, to engage in future competition with their employer after termination, as long as they do not use the employer's confidential information, and Stanton contends that McAtee made her own decision to leave Wachovia and then sought employment with Stanton.

      *ii.*    *Analysis*. To establish a claim of breach of contract under Iowa law, Wachovia must establish the following elements: (1) the existence of a contract between the parties; (2) the terms and conditions of the contract; (3) Wachovia performed all the terms and conditions required under the contract; (4) Stanton breached the contract in some particular way; and (5) Wachovia suffered damages as a result of the breach. *Kaydon Acquisition Corp. v. Custum Mfg., Inc.*, 317 F. Supp. 2d 896, 912 (N.D. Iowa 2004) (citing *Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998)). "A party breaches a contract when, without legal excuse, it fails to perform any promise which forms a whole or a part of the contract." *Id.* (citing *Molo Oil*, 578 N.W.2d

at 224, in turn citing *Magnusson Agency v. Public Entity Nat'l Co.-Midwest*, 560 N.W.2d 20, 27 (Iowa 1997)). Missouri law is not to the contrary. *See, e.g., Viacom Outdoor, Inc. v. Taouil*, 254 S.W.3d 234, 238 (Mo. Ct. App. E.D. 2008) ("'To establish a submissible case of breach of contract, a plaintiff must first establish the existence of an agreement.'") (quoting *Gateway Exteriors, Inc. v. Suntide Homes, Inc.*, 882 S.W.2d 275, 279 (Mo. Ct. App. E.D. 1994); *Midwest Bankcentre v. Old Republic Title Co. of St. Louis*, 247 S.W.3d 116, 128 (Mo. Ct. App. E.D. 2008) ("The elements that must be proven in order for a party to recover for breach of contract are: (1) the existence of an enforceable contract between the parties; (2) mutual obligations arising under the terms of the contract; (3) one party's failure to perform the obligations imposed by the contract; and (4) the resulting damage to the other party.") (citing *McClain v. Papka*, 108 S.W.3d 48, 53 (Mo. Ct. App. E.D. 2003).

The court finds that Wachovia likely can establish the existence of Stanton's 1996 employment contract and that the contract prohibits her from using customer information, soliciting customers of Wachovia, and soliciting employees of Wachovia, at least sufficiently for present purposes. *See* Complaint, Declaration of Joseph Wood, Exhibit B, § 2 (quoted above, beginning on page 7); *see also Kaydon Acquisition Corp.*, 317 F. Supp. 2d at 912 (first two elements of a breach-of-contract claim under Iowa law are existence of the contract and its terms); *see also Viacom Outdoor, Inc.*, 254 S.W.3d at 238 (first element under Missouri law is existence of a contract); *Midwest Bankcentre*, 247 S.W.3d at 128 (first two elements under Missouri law are existence of a contract and mutual obligations arising under the terms of the contract).[6] Stanton nevertheless contends

---

[6]Stanton has not asserted that Wachovia does not stand in Edwards's shoes with respect to the rights under and the enforcement of the 1996 Agreement. The court notes

(continued...)

that the 1996 Agreement is no longer applicable to her, because she was a "financial consultant," not just a "sales assistant. The court is inclined to agree with Stanton that she was a *de facto* financial consultant, not merely an assistant who provided administrative support, as Wachovia would have it, where she had her own substantial "book" of customers (some 200) that she had developed and for whom she received commissions under her own production number, as well as additional customers that she serviced with Tom McClinton and for whom she split commissions with Tom McClinton under a joint production number. Even so, the court finds that Stanton only asserts that she considered herself to be and that her clients considered her to be a financial consultant, not that her position or job title actually changed. No party has identified any provision of the 1996 Agreement that would have caused that Agreement to terminate because of a change in Stanton's duties, nor has any party produced a subsequent agreement superseding or terminating the 1996 Agreement or identifying Stanton's position as a "financial consultant" rather than a "registered sales assistant." Thus, the court concludes, at least for purposes of a temporary restraining order, that the terms of the 1996 Agreement apply to Stanton. On the present record, it also appears that Wachovia performed all of the terms and conditions required under the contract by providing Stanton with employment, pay, and benefits. *See id.* (the contract states that the covenants are "in consideration of such acceptance and employment"); *Kaydon Acquisition Corp.*, 317 F. Supp. 2d at 912 (third element of a breach-of-contract claim under Iowa law).

---

[6](...continued)
that the 1996 Agreement does contain an express "successors" clause in ¶ 30, and Stanton does not dispute that Wachovia and Edwards merged, with Wachovia emerging as the surviving entity, so that Wachovia has made sufficient showing for purposes of obtaining a temporary restraining order that it is a "successor" to Edwards entitled to enforce the 1996 Agreement. *See* Complaint, Declaration of Joseph Wood, Exhibit B, § 30.

Even so, Wachovia has not established, even to the extent necessary to warrant a temporary restraining order, that Stanton has breached the covenants as to disclosure of client information or solicitation of employees, although Wachovia may have made a sufficient showing that Stanton breached the contract by soliciting customers. *Kaydon Acquisition Corp.*, 317 F. Supp. 2d at 912 (fourth element of a breach-of-contract claim under Iowa law is breach by the defendant); *Midwest Bankcentre*, 247 S.W.3d at 128 (third element under Missouri law is breach by the defendant). The "non-disclosure" provisions of the 1996 Agreement define information that cannot be disclosed as including the names, addresses, telephone numbers, and assets and obligations carried in the accounts of its customers, and states that use of such records and documents, whether generated and prepared by Stanton or furnished to Stanton by Edwards, as permitted by Edwards, shall cease immediately upon events including resignation and acceptance of other employment. Complaint, Declaration of Joseph Wood, Exhibit B, § 2. It also prohibits removal by Stanton of such records or documents from the premises of Edwards in either original, duplicate, or copied form, except in the ordinary course of conducting business for, and subject to the approval by, Edwards and also requires immediate delivery to Edwards, prior to the termination of employment, any such records and documents in the employee's possession or control. *Id.* Finally, the 1996 Agreement provides that Stanton shall not disclose to any person, firm, association, partnership, corporation or other entity, the contents, in whole or in part, of such records and documents, except in the ordinary course of conducting business for Edwards. *Id.* The problem is that Wachovia has offered only speculation, based on information and belief, not evidence, that Stanton has taken or disclosed any such information or that she has any such information to return, while Stanton offers a sworn affidavit that she did not take or disclose any such information. It may be that a forensic analysis of computer records could or would show that Stanton did

take such information, but there is no such evidence in the record yet, owing, perhaps, to the expedited nature of proceedings on motions for temporary restraining order in federal court. Further discovery might also establish that every client of Stanton and McClinton of any significance was contacted at or near the same time belying Stanton's claim that only some clients, drawn from memory, were contacted.

Similarly, the 1996 Agreement provides that Stanton shall not recruit, entice, induce or solicit, directly or indirectly, any employee of Edwards or any of its affiliates for employment with any other organization which does business in securities, commodities and financial futures, insurance or any other lines of business in which Edwards or any of its affiliates is engaged. *Id.* Again, Wachovia offers only speculation from the circumstances that Stanton induced McAtee to join her at CSA, but Stanton offers her sworn statement that she did not suggest that McAtee quit her job at Wachovia or offer her a job at CSA until McAtee had already resigned from Wachovia. The court declines to hold that "indirect" solicitation has occurred simply because, while the defendant and the allegedly solicited employee were co-employees, both expressed their desire to leave their employment and to continue to work together. *Cf. Crawford & Co. v. M. Hayes & Assocs., L.L.C.*, 13 Fed.Appx. 174, 176 (4th Cir. 2001) (under Maryland law, no breach of fiduciary duty occurred where an employee did no more than unite a group of employees contemplating future competition with their employer).[7]

───────────────

[7]The court disagrees, however, with Stanton's suggestion that either *Crawford & Co.* or *PFS Distrib. Co. v. Raduechel*, 492 F. Supp. 2d 1061, 1075 (S.D. Iowa 2007), stands for the proposition that an employee may arrange with fellow employees to compete with their employer. *See Crawford & Co.*, 13 Fed.Appx. at 176 (citing *Duane Jones Co. v. Burke*, 306 N.Y. 172, 117 N.E.2d 237, 245 (N.Y. 1954), for the proposition that a breach of duty occurs where an employee recruits subordinate employees and customers (continued...)

On the other hand, Wachovia has shown sufficiently, at least for purposes of obtaining a temporary restraining order, that Stanton improperly solicited Wachovia's customers. The 1996 Agreement prohibits Stanton from directly or indirectly soliciting or aiding in the solicitation on behalf of any other organization, any customers having accounts with Edwards with whom she had any dealings whatsoever during the term of her employment with Edwards when such other organization does business in securities, commodities and financial futures, insurance or other lines of business in which Edwards or any of its affiliates is engaged. Complaint, Declaration of Joseph Wood, Exhibit B, § 2. The July 18, 2008, letter sent by Stanton and McAtee at least arguably asked some Wachovia customers to consider working with CSA, instead of Wachovia. *See* Complaint, Alan Bowles Declaration, Exhibit C (July 18, 2008, letter). The court finds that, although the July 18, 2008, letter attempts to stay in the "gray area" between notice that Stanton had moved to a new employer and outright solicitation of customers to join her, the letter actually crosses the line into solicitation. This is so, for example, because the letter states, "At Century, we are able to offer all the products and services you are accustomed to," that "We are able to work with you and provide the same great service you are used to," and "We look forward to working with you again." Complaint, Alan Bowles Declaration, Exhibit C. These statements strongly suggest an invitation to do business with CSA instead of Wachovia.

The July 14, 2008, letter from Stanton to specific customers is, perhaps, even further over the line, because it is not simply notification that Stanton has taken other

---

[7](…continued)
prior to resignation); *PFS Distrib. Co.*, 492 F. Supp. 2d at 1077 (finding breach of a duty of loyalty where an employee began talking with other employees about beginning a rival firm months before quitting).

employment, or advice that a customer now has a choice of brokers, but takes for granted that the addressee will continue to avail himself or herself of Stanton's services. This inference arises from statements that "I will provide you with the personal service and investment counseling you need," not that Stanton "can" or "would like to" provide those services, the closing, which thanks the customer "for the continued opportunity to be of service," and Stanton's statement that she "look[s] forward to a long and rewarding relationship. Complaint, Alan Bowles Declaration, Exhibit B. A customer receiving such a letter seems to be presented with a *fait accompli* that the customer's account will move or has moved with Stanton, not with a choice of whether or not to move the customer's account with Stanton to CSA.

Wachovia has also provided sufficient evidence, for purposes of a temporary restraining order, to show that Stanton's breach of the restrictive covenants by improperly soliciting customers has damaged or threatens to damage Wachovia in terms of loss of clients, business, and reputation. *Kaydon Acquisition Corp.*, 317 F. Supp. 2d at 912 (last element of a breach-of-contract claim is damages to the claimant from the breach). This court has observed that, in similar circumstances, "it can be reasonably expected that some of the patrons or customers [the defendant] served while in [the plaintiff's] employment will follow h[er] to the new employment.'" *Pro Edge, L.P.*, 374 F. Supp. 2d at 740 (quoting *Dental East, P.C. v. Westercamp*, 423 N.W.2d 553, 555 (Iowa Ct. App. 1988), with citation and quotation marks omitted)).

Of course, the contract term allegedly breached must be enforceable, and it is on this requirement that Wachovia's breach-of-contract claim founders. Under Iowa law, a court determines if an employment contract containing a restrictive covenant, such as the non-disclosure and non-solicitation provision at issue here, is enforceable by posing three inquiries: (1) Is the restriction reasonably necessary for the protection of the employer's

business; (2) is it unreasonably restrictive of the employee's rights; and (3) is it prejudicial to the public interest? *Pro Edge, L.P. v. Gue*, 374 F. Supp. 2d 711, 739 (N.D. Iowa 2005) (citing *Revere Transducers, Inc. v. Deere & Co.*, 595 N.W.2d 751, 761 (Iowa 1999), in turn citing *Lamp v. American Prosthetics, Inc.*, 379 N.W.2d 909, 910 (Iowa 1986), and *American Express Financial Advisors, Inc. v. Yantis*, 358 F. Supp. 2d 818, 829 (N.D. Iowa 2005); *Lemmon v. Hendrickson*, 559 N.W.2d 278, 282 (Iowa 1997); *Iowa Glass Depot, Inc. v. Jindrich*, 338 N.W.2d 376, 381 (Iowa 1983); and *Cogley Clinic v. Martini*, 253 Iowa 541, 112 N.W.2d 678, 681 (Iowa 1962)). Restrictive covenants must also be "tightly limited" as to both time and area. *Id.* at 740. Again, Missouri law is not to the contrary. *See, e.g., Victoria's Secret Stores, Inc. v. May Dep't Stores Co.*, 157 S.W.3d 256, 260 (Mo. Ct. App. E.D. 2004) (restrictive covenants in employment contracts require the court to determine reasonableness based on a balance of the needs of the employer and the employee, defined as "(1) the employer's need to protect legitimate business interests, such as trade secrets and customer lists; (2) the employee's need to make a living; and (3) the public's need to secure the employee's presence in the labor pool," and the restrictions must be reasonable as to time and place); *Schmersahl, Treloar & Co., P.C. v. McHugh*, 28 S.W.3d 345, 349 (Mo. Ct. App. E.D. 2000) ("A restrictive covenant in an employment agreement is only valid and enforceable if it is necessary to protect one of two well-defined interests, trade secrets and customer contacts, and if it is reasonable as to time and place.").

The court finds that Wachovia has made sufficient showing on the first inquiry, that the restrictions are reasonably necessary for protection of its business, *see Pro Edge, L.P.*, 374 F. Supp. 2d at 739; *Victoria's Secret Stores, Inc.*, 157 S.W.3d at 260, at least for purposes of a temporary restraining order. Here, Wachovia has demonstrated sufficiently that client lists and confidential client information are the "lifeblood" of a financial

services business, and where an improper solicitation has occurred, "it can be reasonably expected that some of the patrons or customers [an employee] served while in [the defendant's] employment will follow h[er] to the new employment.'" *Pro Edge, L.P.*, 374 F. Supp. 2d at 740 (quoting *Dental East, P.C. v. Westercamp*, 423 N.W.2d 553, 555 (Iowa Ct. App. 1988), with citation and quotation marks omitted). Contrary to Stanton's contentions, the court does not find that the Protocol For Broker Recruiting, signed by Edwards and Wachovia, but not by CSA or Stifel, demonstrates that the non-solicitation covenant is not reasonably necessary in every circumstance. The Protocol provides that, *where both the former firm and the new firm are signatories*, a departing registered representative may solicit his or her clients to move to the registered representative's new firm. *See* Opposition, Exhibit B (the Protocol applies "When RRs move from one firm to another and both firms are signatories to this protocol," and "RRs that comply with this protocol would be free to solicit customers that they serviced while at their former firms, but only after they have joined their new firms."). That provision does not mean, however, that there is no need for a non-solicitation covenant when the former firm *is* a signatory, but the new firm is *not* a signatory. Where both parties are signatories, they have essentially agreed to reciprocal "poaching" of registered representatives and the registered representative's clients from the former firm, apparently on the assumption that they will gain as much as they lose in the exchange. On the other hand, where the new firm is not a signatory, the old firm has no reciprocal benefit to look forward to, and a prohibition on solicitation of clients by a departing registered representative is still reasonably necessary to protect the former firm's client base from "poaching" by the new, non-Protocol firm. *Contra Merrill Lynch, Pierce, Fenner& Smith v. Brennan*, 2007 WL 632904, *2 (N.D. Ohio Feb. 23, 2007) (slip op.) (a Protocol firm "tacitly accepts" that registered representatives will leave and then solicit clients to move to their new firm, even

if the new firm is a non-Protocol firm); *Smith Barney Div. of Citigroup Global Mkts., Inc. v. Griffin*, 23 Mass. L. Rptr. 457, 2008 WL 325269, *7 (Mass. Super. 2008) (a signatory firm cannot claim irreparable harm when a registered representative leaves for a non-signatory firm, then solicits clients to move to the new firm, where the signatory firm has accepted such conduct if the registered representative moves to 38 other signatory firms).

The court also has concerns that the restrictions are unreasonably restrictive on Stanton's rights, *Pro Edge, L.P.*, 374 F. Supp. 2d at 739 (second inquiry); *Victoria's Secret Stores, Inc.*, 157 S.W.3d at 260 (same)—even though the restrictions do *not* impose any limitation at all on Stanton's employment with a competitor doing what she was doing for Wachovia, but only prevent her from using Wachovia's confidential client lists and other confidential information to do it—because there is no temporal limitation at all in the restriction on the solicitation of customers. *Compare id.* (finding geographic and temporal restrictions were not unreasonably restrictive on the employee, and the employee could still practice his business of veterinary medicine). It is possible that, on a fuller record, the lack of a time limitation in this case can be shown to be reasonable. Moreover, the court has the authority under Iowa law to modify or reform a restrictive covenant to make its limitations reasonable, *see, e.g., The Phone Connection, Inc. v. Harbst*, 494 N.W.2d 445, 449 (Iowa Ct. App. 1992), and this court would do so if the covenant was otherwise enforceable but for the omission of an appropriate time limitation. Nevertheless, the absence of such a time limitation may suggest that the covenant may improperly impose on Stanton's rights.

The third inquiry, prejudice to the public interest, *Pro Edge, L.P.*, 374 F. Supp. 2d at 739 (third inquiry); *Victoria's Secret Stores, Inc.*, 157 S.W.3d at 260 (same), presents further difficulties. Although the 1996 Agreement still applies to Stanton, despite her *de facto* position as a "financial consultant," the court finds that, because of her *de facto*

position, the covenant *may* unduly interfere with the public's interest in choice of financial consultants and continuation of a client relationship that properly belongs to the client and the financial consultant, not to the firm, as Wachovia and Edwards have acknowledged. Wachovia's counsel acknowledged that part of the reason for imposing a non-solicitation covenant on a "sales assistant," but not on a "financial consultant," might be that the client relationship belongs to the financial consultant, not the firm, but that a sales assistant does not have his or her own clients. Here, at least on the present record, it appears that Stanton did have her own clients. Moreover, although the Protocol, signed by both Edwards and Wachovia, does not make non-solicitation agreements unnecessary, the Protocol does recognize that its "principal goal" is "to further the clients' interests of privacy and freedom of choice in connection with the movement of their Registered Representatives ("RRs") between firms." Opposition, Exhibit B. Edwards also had a long-standing policy, practice, and firm culture, confirmed by statements of its chief executive officers, both before and after the merger with Wachovia was announced, *see* Opposition, Exhibits A and C, of recognizing that the client relationship is owned by the financial advisor, not the firm. Courts and FINRA arbitration panels have also recognized that restrictions on a financial consultant's ability to solicit former clients is contrary to the public interest. *See, e.g., Smith Barney v. Burrow*, ___ F. Supp. 2d ___, 2008 WL 2095739, *17 (E.D. Cal. May 16, 2008) ("[T]he public interest is better served with open competition in the securities field and access to advisors of clients' choice. The balance of equities and public interest factors weigh in defendants' favor," warranting denial of a preliminary injunction to enjoin solicitation by defendant financial consultants of clients from a former employer); *Wachovia Securities v. Gates*, 2008 WL 1803612, *3 (E.D. Va. 2008) (holding that customers, who were not parties to the non-solicitation agreement, should be free to maintain their relationship with departing account representatives,

because restricting customer choice would not serve the public interest); *A.G. Edwards & Sons, Inc. v. Stifel, Nicolaus & Co., Inc.*, FINRA Case No. 07-02897 (defendant's Opposition, Exhibit G) (Nov. 20, 2007) (denying a request for permanent injunction against account representatives, because customer rights are of "primary importance"); *but see Merrill Lynch, Pierce, Fenner & Smith v. Maroca*, 1999 WL 1253937 (NASD Feb. 17, 1999) (finding no imposition on public interest and granting permanent injunctive relief); *Dufour v. Merrill Lynch, Pierce, Fenner & Smith,* 1999 WL 1485504 (NASD Sept. 29, 1999) (same); *Merrill Lynch, Pierce, Fenner & Smith v. UBS Paine Webber, Inc.*, 2001 WL 1004178 (NASD June 6, 2001) (same).

The court is not willing at this time to hold that the covenants in the 1996 Agreement violate public policy *per se*, because the court believes that the question is a close one worthy of more review and reflection than the expedited proceedings on a temporary restraining order permit. Nevertheless, where whether the covenants in the 1996 Agreement are valid or invalid on public interest grounds is a close question, the public interest concern raised by the covenants is sufficient to call into serious question the enforceability of those covenants. The concern about enforceability of the covenants, in turn, weighs against Wachovia's likelihood of success on the merits of its breach-of-contract claim.

### b. *Misappropriation of trade secrets*

The court must also consider whether Wachovia has sufficient likelihood of success on its "trade secrets" claim to warrant a temporary restraining order. The court begins its analysis of that question with a summary of the arguments of the parties.

### i. *Arguments of the parties*. 
Wachovia argues that it has sufficient likelihood of success on its claim that Stanton has misappropriated trade secrets to warrant a temporary restraining order. Wachovia argues that the information it is seeking to protect

is a "trade secret," because courts have recognized that customer lists are trade secrets, in that they are useful to a competitor and would require time and effort to duplicate, so that the information has independent economic value, and Wachovia has taken reasonable steps to maintain the secrecy of the information. Wachovia also argues that it has made an adequate showing that Stanton has misappropriated its trade secrets, because Stanton used trade secret customer information to solicit Wachovia's customers to switch their accounts to CSA, and she knew that the trade secrets were acquired under circumstances giving rise to a duty to maintain their secrecy or to limit their use.

Stanton argues that she simply did not take any information at all from Wachovia and that the customer information in question is not all "trade secrets," even if she had taken it. More specifically, she argues that she could properly contact, and did contact, customers whose identities she retained in her memory and she then contacted them using only publicly available address and telephone number information. She also contends that Wachovia cannot claim that it took reasonable efforts to maintain the secrecy of some of the client information, if it is trade secret information, where Edwards and Wachovia repeatedly told financial consultants that client relationships belonged to the financial consultants, not the firm; that Edwards has always allowed departing financial consultants to take customer information and to use that information to solicit customers to follow them; and that both Edwards and Wachovia have signed the Protocol For Broker Recruiting permitting departing financial consultants to take certain information with them. Stanton argues that various courts have recognized that information covered by the Protocol does not constitute a trade secret. Even in the absence of the Protocol, however, Stanton argues that courts have recognized that it is securities industry practice for financial consultants to take certain client information with them when they change employers.

*ii.*     *Analysis*.  Wachovia's trade secrets claim is based on the Iowa Uniform Trade Secrets Act, Iowa Code Ch. 550.  This court recently examined the Iowa Uniform Trade Secrets Act in some detail in a preliminary injunction case, *Interbake Foods, L.L.C., v. Tomasiello*, 461 F. Supp. 2d 943, 962-68 (N.D. Iowa 2006).  This court noted that the Iowa Supreme Court has previously discussed the essential features of the Trade Secrets Act in *Economy Roofing & Insulating Co. v. Zumaris*, 538 N.W.2d 641 (Iowa 1995):

> Iowa Code section 550.3(1) (1991) provides that "[t]he owner of a trade secret may petition the district court to enjoin an actual or threatened misappropriation."  Iowa Code section 550.4(1) provides that "an owner of a trade secret is entitled to recover damages for the misappropriation."
>
> Iowa Code section 550.2(4) defines a trade secret as information, including but not limited to a formula, pattern, compilation, program, device, method, technique, or process that is both of the following:
>
> a.     Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by a person able to obtain economic value from its disclosure or use.
>
> b.     Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.
>
> Iowa Code § 550.2(4).
>
> Iowa Code section 550.2(3) in pertinent part defines misappropriation as doing any of the following:
>
> a.     Acqui[ring] a trade secret by a person who knows that the trade secret is acquired by improper means.
>
> b.     Disclos[ing] or us[ing] a trade secret by a person who uses improper means to acquire the trade secret.
>
> c.     Disclos[ing] or us[ing] a trade secret by a person who at the time of disclosure or use, knows that the trade secret is derived from or through a person

46

who had utilized improper means to acquire the trade secret.

Iowa Code § 550.2(3).

"Improper means" is defined as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage, including but not limited to espionage through an electronic device." Iowa Code § 550.2(1).

*Economy Roofing*, 538 N.W.2d at 646; *see 205 Corp. v. Brandow*, 517 N.W.2d 548, 550 (Iowa 1994) (noting that sections 550.4 and 550.5 provide for damages or injunctions as recourse for misappropriation of trade secrets, respectively, and also quoting the statute's definition of trade secrets in 550.2(4)). Thus, in order to prevail on a statutory claim of misappropriation of trade secrets under Iowa law, a plaintiff must prove the following: (1) the existence of a trade secret, as defined by IOWA CODE § 550.2; (2) acquisition of the secret by improper means, as defined by IOWA CODE § 550.2(1); and (3) unauthorized use or disclosure of the secret, as defined in IOWA CODE § 550.2(3). *Cf. Sioux Biochemical, Inc. v. Cargill, Inc.*, 410 F. Supp. 2d 785, 806 (N.D. Iowa 2005) (describing the second element as acquisition of the trade secret as a result of a confidential relationship, citing *Lemmon v. Hendrickson*, 559 N.W.2d 278, 279 (Iowa 1997)).

Here, the court finds that Wachovia has made sufficient showing, at least for purposes of obtaining a temporary restraining order, that at least some of the client information in question is a trade secret within the meaning of IOWA CODE § 550.2(4). *See Sioux Biochemical, Inc.*, 410 F. Supp. 2d at 806 (first element). The client information is "information," and perhaps more specifically still, a "compilation," that "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by a person able to obtain economic value from its disclosure or use," and "[i]s the subject of efforts that are reasonable under the

circumstances to maintain its secrecy." Iowa Code § 550.2(4). Even where some of the information contained in a client list, such as telephone numbers and addresses, is not itself a trade secret, the compilation of such information in a client list *is* a trade secret. Again, Wachovia has demonstrated sufficiently that client lists and confidential client information are the "lifeblood" of a financial services business and that it has gone to considerable expense and effort, often over a period of years, to accumulate such information. Wachovia has also shown that it has taken reasonable efforts to maintain the secrecy of such information, for example, by imposing both contractual and policy limitations on the use and disclosure of such information, as set forth in Stanton's employment contract, *see* Complaint, Declaration of Joseph Wood, Exhibit B, § 2 (quoted above, beginning on page 7), and Section 9.2 of Edwards's Sales Practice Manual, which was made available to all of Edwards's employees. Complaint, Declaration of Joseph Wood, Exhibit C, § 9.2 (quoted above, beginning on page 11). For essentially the same reasons that the court ruled above, with regard to Wachovia's breach-of-contract claim, that the Protocol does not make restrictions on solicitation of clients by a departing financial consultant not reasonably necessary, the court now concludes that the Protocol does not demonstrate that Wachovia did not take reasonable steps to protect trade secret client lists and client information against disclosure to a non-Protocol firm.

The element on which Wachovia's trade secrets claim fails, however, is a sufficient showing that Stanton acquired the trade secrets by improper means, as defined by Iowa Code § 550.2(1). *See Sioux Biochemical, Inc.*, 410 F. Supp. 2d at 806 (first element). Wachovia has not pointed to evidence that Stanton could only have obtained the trade secrets by breaching her duty to maintain secrecy of the information, as required by the contract and policy provisions identified above. Iowa Code § 550.2(1) (defining "improper means," *inter alia*, as breach of a duty to maintain secrecy of the information).

On the other hand, Stanton has presented sworn testimony that she simply did not take any client information from Wachovia. Similarly, where Wachovia cannot show that Stanton took any trade secret information, Wachovia has not made sufficient showing, even for present purposes, that Stanton made unauthorized use or disclosure of the secret, as defined in IOWA CODE § 550.2(3). *See Sioux Biochemical, Inc.*, 410 F. Supp. 2d at 806 (third element).

Therefore, upon the present record, the court finds that Wachovia also does not have sufficient likelihood of success on its misappropriation of trade secrets claim to warrant a temporary restraining order to restrain further misappropriation.

### 2.    *Threat of irreparable harm*

Although the court has found that Wachovia does not have sufficient likelihood of success on the merits of its breach-of-contract or trade secrets claims to warrant a temporary restraining order, the court will nevertheless consider the remaining "*Dataphase* factors." The second "*Dataphase* factor" is the threat of irreparable harm to the movant absent the injunction. *Dataphase,* 640 F.2d at 114. In this circuit, "a party moving for a preliminary injunction is required to show the threat of irreparable harm," *Baker Elec. Co-op.*, 28 F.3d at 1472 (citing *Modern Computer Sys.*, 871 F.2d at 738, and *Dataphase*), and the lack of irreparable harm is sufficient ground for denying or vacating a preliminary injunction. *Aswegan v. Henry*, 981 F.2d 313, 314 (8th Cir. 1992) (citing *Modern Computer Sys.*, 871 F.2d at 738). Stated differently, "[t]he threshold inquiry is whether the movant has shown the threat of irreparable injury." *Glenwood Bridge*, 940 F.2d at 371 (quoting *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987)). More specifically, the Eighth Circuit Court of Appeals has held that

> the movant's failure to sustain its burden of proving irreparable harm ends the inquiry "and the denial of the

injunctive request is warranted." [*Gelco*, 811 F.2d] at 420. *Accord Modern Computer Sys.*, 871 F.2d at 738; *Dataphase*, 640 F.2d at 114 n.9. We must inquire, then, whether [the movant] has met its burden of proving that it will suffer irreparable harm absent a preliminary injunction.

*Id.* The Eighth Circuit Court of Appeals has also explained,

"[T]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Beacon Theaters, Inc. v. Westover,* 359 U.S. 500, 506-07 (1959). Thus, to warrant a preliminary injunction, the moving party must demonstrate a sufficient threat of irreparable harm. *See Adam-Mellang v. Apartment Search, Inc.,* 96 F.3d 297, 299 (8th Cir. 1996).

*Bandag, Inc. v. Jack's Tire & Oil, Inc.,* 190 F.3d 924, 926 (8th Cir. 1999); *see Baker Elec. Co-op.,* 28 F.3d at 1472 ("No single factor in itself is dispositive; in each case all of the factors must be considered to determine whether on balance, they weigh towards granting the injunction. However, a party moving for a preliminary injunction is required to show the threat of irreparable harm.") (internal quotation marks and citations omitted).

Sufficient showing on this second factor in the *Dataphase* analysis can be made, for example, by showing that the movant has no adequate remedy at law. *Baker Elec. Co-op.,* 28 F.3d at 1473. Conversely, where the movant has an adequate legal remedy, a preliminary injunction will not issue. *Frank B. Hall & Co. v. Alexander & Alexander, Inc.*, 974 F.2d 1020, 1025 (8th Cir. 1992) (but finding in that case that the district court's conclusion that there was an adequate remedy was based on an erroneous legal premise, and requiring a proper balance of *Dataphase* factors).

### a.     Arguments of the parties

Wachovia argues that it has suffered or is likely to suffer irreparable harm, for which there is no adequate remedy at law, because it is extremely difficult to quantify the

future economic losses that it will suffer from loss of its clients and their accounts to a competitor, let alone to quantify the value of the loss of confidence, goodwill, and reputation that may arise from compromising clients' expectations of privacy as a result of Stanton's conduct. Wachovia also argues that the Iowa Supreme Court has recognized that injunctive relief is the sole means of restoring an employer to the position it would have enjoyed had an employee not violated a restrictive covenant.

Stanton argues that Wachovia has not suffered and is not threatened with any irreparable harm. She argues that, by signing the Protocol, both Edwards and Wachovia acknowledged that they would have no irreparable harm from a departing financial consultant's retention and use of certain client information. She argues that courts have so held, even where the financial consultant's new firm was not a signatory to the Protocol, if the former firm was a signatory. She also argues that, contrary to Wachovia's contentions, Wachovia has an adequate remedy at law. She argues that mere loss of income is not an irreparable harm, and the securities industry is such that economic losses from competition by a former employee is determinable.

### b.    Analysis

In *Pro Edge*, this court observed,

> Initially, the court notes that "[i]ntangible injuries, such as injury to goodwill and business relationships with customers, may be found to constitute irreparable harm." *American Express Fin. Advisors, Inc. v. Yantis*, 358 F. Supp. 2d 818, 835 (N.D. Iowa 2005) (citing *Moore Bus. Forms, Inc. v. Wilson*, 953 F. Supp. 1056 (N.D. Iowa 1996)). On many occasions, courts in a number of states, as well as this court, have held that the mere violation of a valid covenant not to compete supports an inference of the existence of a threat of irreparable harm. *See, e.g., Moore Bus. Forms, Inc.*, 953 F. Supp. at 1056 (citing cases arising in other states finding

irreparable harm from the violation of a valid covenant not to compete); *Uncle B's Bakery [v. O'Rourke]*, 920 F. Supp. [1405,]1434-36 [(N.D. Iowa 1996)] (finding threat of irreparable harm in form of trade secret misappropriation in violation of confidentiality agreement where former employee went to work for competitor); [*750] *Curtis 1000 [v. Youngblade]*, 878 F. Supp. [1224,] 1273 [(N.D. Iowa 1995)] (finding irreparable harm arising from covenant not to compete). The Eighth Circuit Court of Appeals has previously adopted and employed this approach without consideration or reference to any particular state's law. *See N.I.S. Corp. v. Swindle*, 724 F.2d 707, 710 (8th Cir. 1984).

*Pro Edge, L.P.*, 374 F. Supp. 2d at 749-50.

The court concludes that, where, as here, the covenants at issue are non-disclosure covenants and a specific kind of non-competition covenant, a non-solicitation covenant, the mere violation of such a covenant also suffices to show irreparable harm, because violation of such covenants involves much the same threat to goodwill and business relationships with customers as violation of a covenant not to compete. *Cf. id.* Indeed, Stanton acknowledged as much by entering into her employment contract, which states the following in § 2:

> IN THE EVENT YOU BREACH ANY OF THE COVENANTS CONTAINED IN THIS PARAGRAPH, YOU ACKNOWLEDGE THAT EDWARDS' REMEDIES AT LAW FOR DAMAGES WILL BE INADEQUATE AND THAT EDWARDS SHALL BE ENTITLED TO INJUNCTIVE RELIEF TO PREVENT YOUR PROSPECTIVE OR CONTINUING BREACH OF THESE PROVISIONS. THIS PROVISION SHALL NOT BE CONSTRUED IN ANY WAY TO CONSTITUTE A WAIVER BY EDWARDS OF ANY AVAILABLE REMEDY AT LAW.

Complaint, Declaration of Joseph Wood, Exhibit B, § 2. Thus, *if* Wachovia had demonstrated violations of these covenants, it would also have demonstrated sufficiently for present purposes that loss of confidential customer information involves a threat of irreparable harm for which there is no adequate remedy at law, *see Baker Elec. Co-op.*, 28 F.3d at 1473 (an adequate showing on this factor can be made, for example, by showing that the movant has no adequate remedy at law), because it is extremely difficult to quantify the future economic losses that it will suffer from loss of its clients and their accounts to a competitor, let alone to quantify the value of the loss of confidence, goodwill, and reputation that may arise from compromising clients' expectations of privacy as a result of Stanton's conduct.[8]

---

[8]Again, the court finds that the Protocol For Broker Recruiting signed by both Edwards and Wachovia, but not by CSA or Stifel, would not change this hypothetical analysis, if Wachovia had proved a violation of one of the covenants in question. The Protocol provides that, *where both the former firm and the new firm are signatories*, a departing registered representative may solicit his or her clients to move to the registered representative's new firm, and the former firm cannot claim damages, let alone irreparable harm. *See* Opposition, Exhibit B (the Protocol applies "When RRs move from one firm to another and both firms are signatories to this protocol," and "RRs that comply with this protocol would be free to solicit customers that they serviced while at their former firms, but only after they have joined their new firms."). That provision does not mean that there is no need for a non-solicitation covenant and no irreparable harm when the former firm *is* a signatory, but the new firm is *not* a signatory. Where both parties are signatories, they have essentially agreed to reciprocal "poaching" of registered representatives and the registered representative's clients from the former firm, apparently on the assumption that they will gain as much as they lose in the exchange. On the other hand, where the new firm is not a signatory, the old firm has no reciprocal benefit to look forward to, and a prohibition on solicitation of clients by a departing registered representative is still reasonably necessary to protect the former firm's client base from "poaching" by the new, non-Protocol firm, and such "poaching" by a non-Protocol firm could cause irreparable harm. *Contra Merrill Lynch, Pierce, Fenner& Smith v. Brennan*, 2007 WL 632904, *2
(continued...)

The problem, again, is that Wachovia *has not* demonstrated for purposes of obtaining a temporary restraining order that covenants were violated or that, if they were violated, they are enforceable. Under these circumstances, Wachovia cannot demonstrate irreparable harm, either. Thus, on the present record, Wachovia not only has not shown that it has sufficient likelihood of success on the merits to warrant a temporary restraining order, it also cannot show any irreparable harm.

### 3. *Balance of harms*

The third "*Dataphase* factor" is the "balance of harms." *See Dataphase,* 640 F.2d at 114 (the third factor is the balance between the harm and the injury that the injunction's issuance would inflict on other interested parties). The "balance of harms" analysis is not identical to the "irreparable harm" analysis. *Pottgen v. Missouri State High Sch. Activities Ass'n*, 40 F.3d 926, 929 (8th Cir. 1994). Irreparable harm focuses on the harm or potential harm to the movant of the opposing party's conduct or threatened conduct. *Dataphase*, 640 F.2d at 114. In contrast, the balance of harms analysis examines the harm of granting or denying the injunction upon both of the parties to the dispute and upon other interested parties, including the public. *Id.*; *see also Glenwood Bridge*, 940 F.2d at 372 (considering the effect of granting or denying the injunction on the public's interest in a public works construction project as well as upon the parties in the balance of harm

---

[8](…continued)

(N.D. Ohio Feb. 23, 2007) (slip op.) (a Protocol firm "tacitly accepts" that registered representatives will leave and then solicit clients to move to their new firm, even if the new firm is a non-Protocol firm); *Smith Barney Div. of Citigroup Global Mkts., Inc. v. Griffin*, 23 Mass. L. Rptr. 457, 2008 WL 325269, *7 (Mass. Super. 2008) (a signatory firm cannot claim irreparable harm when a registered representative leaves for a non-signatory firm, then solicits clients to move to the new firm, where the signatory firm has accepted such conduct if the registered representative moves to 38 other signatory firms).

analysis); *Modern Computer Sys.*, 871 F.2d at 737-38 (harm to other interested parties also considered).

In conducting the "balance of harms" analysis required under *Dataphase*, it is obvious that an illusory harm to the movant will not outweigh any actual harm to the non-movant. *Frank B. Hall*, 974 F.2d at 1023. To determine what must be weighed, the court finds that courts of this circuit have looked at the threat to each of the parties' rights that would result from granting or denying the injunction. *Baker Elec. Co-op.*, 28 F.3d at 1473. Also, the potential economic harm to each of the parties and to interested third parties of either granting or denying the injunction is relevant. *Id.* Another consideration in the balance of harms calculus is whether the defendant has already voluntarily taken remedial action. *Sanborn Mfg.*, 997 F.2d at 489. Where the non-movant has taken such action, the balance of harms is readjusted, because the potential for economic or other harm to the movant has been eliminated. *Id.* (citing *Burndy Corp. v. Teledyne Indus., Inc.*, 748 F.2d 767, 774 (2d Cir. 1984), which held that injunctive relief was "wholly unnecessary" when the defendant had voluntarily brought his product labeled with the UL mark into compliance with UL standards and where there was not a likelihood of repetition or hazard to the public). Similarly, present harm as the result of past misconduct is not sufficient to justify the injury to the non-movant of granting a preliminary injunction requiring some additional corrective action, because such relief "goes beyond the purpose of a preliminary injunction." *Id.* at 490.

### a.    *Arguments of the parties*

Wachovia argues that Stanton has no potential harm or detriment that outweighs the irreparable harm to Wachovia that it has already demonstrated. Wachovia argues that Stanton has breached her contractual and fiduciary commitments to Wachovia and has induced, solicited, or assisted Wachovia's customers and employees to join her at her new

firm. Thus, Wachovia argues that equity does not favor Stanton. Wachovia also argues that Stanton cannot complain of any financial detriment that results from her own breach of her duties to maintain confidentiality of the information that she has pirated. Wachovia also argues that the temporary restraining order will do no more than maintain the status quo pending arbitration, so that Stanton will not be prejudiced.

Stanton argues that, while Wachovia has no irreparable harm to support a temporary restraining order, she would suffer irreparable harm if she is forced to rebuild her career from scratch by injunctive relief that bars her from contacting any of her former clients. She also argues that Wachovia should be barred by unclean hands and equitable estoppel from seeking the injunctive relief at issue here.

### b.    Analysis

The court must look at the threat to each of the parties' rights that would result from granting or denying the injunction, *Baker Elec. Co-op.*, 28 F.3d at 1473, but finds no substantial threat to Wachovia's right to maintain the secrecy of its client lists and to retain its customer base, where it has not made sufficient showing of likelihood of success on the merits of its claims to warrant a temporary restraining order, so that the countervailing right on Stanton's part to maintain her customer relationships outweighs Wachovia's illusory harm. *Frank B. Hall*, 974 F.2d at 1023 (an illusory harm to the movant will not outweigh any actual harm to the non-movant). Therefore, the balance of harms factor also weighs against granting Wachovia's request for a temporary restraining order.

### 4.    The public interest

The final "*Dataphase* factor" is "the public interest." *See Branstad I*, 118 F. Supp. 2d at 943; *see also Pottgen*, 40 F.3d at 929; *Dataphase,* 640 F.2d at 114. The "public interest" factor frequently invites the court to indulge in broad observations about conduct that is generally recognizable as costly or injurious. *Id.* However, there are more

concrete considerations, such as reference to the purposes and interests any underlying legislation was intended to serve, a preference for enjoining inequitable conduct, and the public's interest in minimizing unnecessary costs to be met from public coffers. *B & D I*, 231 F. Supp. 2d at 912 (citations and quotation marks omitted).

Wachovia argues that Stanton's conduct is unethical and inequitable, so that the public interest favors a temporary restraining order on such conduct. Wachovia also argues that the public will suffer no detriment if Stanton is restrained, because the public's choice of brokers is not thereby limited. Stanton argues, however, that the public interest will be serious impinged by an injunction that interferes with the public's right to information about and choice of brokers. She argues that customers' rights are paramount.

For essentially the same reasons that the court found, above, beginning on page 42, that the public interest called into serious question the enforceability of the restrictive covenants at issue here, for purpose of Wachovia's breach-of-contract claim, the court now concludes that the public interest does not favor granting a temporary restraining order, as required by the final "*Dataphase* factor." To put it another way, public policy concerns about the enforceability of the covenants ripens into a public policy bar on a temporary restraining order, in light of public interest favoring customer choice of brokers and recognizing that the client relationship belongs to the financial consultant, not the firm. Where whether the covenants in the 1996 Agreement are valid or invalid on public interest grounds is a close question, the public interest concern raised by the covenants is sufficient to call into serious question the enforceability of those covenants. The public interest concern about enforceability of the covenants, in turn, weighs against Wachovia's likelihood of success on the merits of its breach-of-contract claim, one "*Dataphase* factor," and also weighs against satisfaction of the "public interest," another "*Dataphase* factor."

That conclusion certainly does not mean that either "public interest" issue—either as to enforceability of covenants or as to appropriateness of preliminary injunctive relief—is resolved finally against Wachovia. To the contrary, it may well be that on a rather more complete record and a fuller opportunity to review the authorities and to reflect upon the matter, the public interest concerns will be resolved in Wachovia's favor.

Nevertheless, the court finds that the public interest weighs against Wachovia's request for a temporary restraining order. Moreover, because none of the pertinent factors ultimately weigh in favor of a temporary restraining order in this case, a temporary restraining order will not issue.

## C. Expedited Discovery

Wachovia requests expedited discovery "in aid of preliminary injunction proceedings before this Court." The court finds that such a request may be all the more urgent, where the court has denied Wachovia's request for a temporary restraining order, but has left open the question of whether Wachovia is nevertheless entitled to a preliminary injunction. In short, more satisfying evidence than Wachovia has thus far marshaled will be required for Wachovia to show that it is entitled to a preliminary injunction.

Wachovia made no argument for such expedited discovery nor any explanation of the anticipated nature or scope of such expedited discovery in its moving papers. At the hearing on August 4, 2008, however, Wachovia suggested that it would like to depose Stanton and possibly other persons to try to determine, *inter alia*, whether and what confidential information of Wachovia she acquired and used to mount her solicitation campaign.

As a colleague in the Eastern District of Missouri recently explained,

Courts use one of two standards to determine whether a party is entitled to conduct expedited discovery. Some courts apply a "good cause" or "reasonableness" standard, while others analyze a set of factors similar to those for obtaining a preliminary injunction. *See Special Situations Cayman Fund, L.P. v. Dot Com Entertainment Group, Inc.*, 2003 WL 23350128 at *1, n. 7 (W.D.N.Y. 2003) (slip op.). The Court of Appeals for the Eighth Circuit has not adopted either standard.

*Monsanto Co. v. Woods*, ___ F.R.D. ___, 2008 WL 821717, *2 (E.D. Mo. March 25, 2008). That court found that the "good cause" standard, which the court explained as follows, was the appropriate standard in that case:

Under the good cause standard, the party requesting expedited discovery must show that the need for expedited discovery, in consideration of administration of justice, outweighs prejudice to responding party. *Semitool, Inc. v. Tokyo Electron Am., Inc.*, 208 F.R.D. 273, 276 (N.D. Cal. 2002); *Qwest Comm. Int'l, Inc. v. WorldQuest Networks, Inc.*, 213 F.R.D. 418, 419 (D. Colo. 2003); *Yokohama Tire Corp. v. Dealers Tire Supply, Inc.*, 202 F.R.D. 612, 613-14 (D. Ariz. 2001). *Cf. Merrill Lynch, Pierce, Fenner & Smith v. O'Connor*, 194 F.R.D. 618, 624 (N.D. Ill. 2000) ("[W]here a plaintiff seeks expedited discovery to prepare for a preliminary injunction hearing, it makes sense to examine the discovery request . . . on the entirety of the record to date and the reasonableness of the request in light of all the surrounding circumstances.").

*Monsanto Co.*, ___ F.R.D. at ___, 2008 WL 821717 at *2. The court found "good cause" in that case, because the plaintiffs had made reasonable attempts to gather the relevant evidence with defendant's cooperation and had narrowly tailored their request for expedited discovery to a limited set of documents and physical samples, and as time passed, the likelihood of discovering relevant evidence decreased, where some of the

physical evidence in question was subject to deterioration. *Id.*; *see also id.* at *3 (finding that, even under the preliminary injunction-style analysis, expedited discovery was appropriate).

This court agrees that, in general, the "good cause" standard should be applied to requests for expedited discovery, balancing the need for expedited discovery, in the administration of justice, against the prejudice to the responding party, and considering the entirety of the record to date and the reasonableness of the request in light of all of the surrounding circumstances. *Id.* Here, the court finds good cause for expedited discovery, in the administration of justice, because such expedited discovery may clarify matters that were outside of Wachovia's (or Stanton's) knowledge and may ultimately lead to the prompt and efficient disposition of this litigation and the parties' underlying dispute. Moreover, the court does not find that Stanton will be prejudiced by permitting properly limited and focused discovery to prepare for the preliminary injunction hearing, where she may also clarify matters outside of her current knowledge.

The court finds that, in the interests of the administration of justice, the number of interrogatories and depositions should be strictly limited. Therefore, the court will permit each party to propound not more than fifteen interrogatories, including discrete subparts, and to notice and conduct depositions of not more than five persons. Such discovery requests shall be made within five days of the date of this order, and responses shall be returned and depositions shall be completed within fourteen days after requests are served. The court cannot reasonably determine prospectively the scope of requests for production of documents, however. Nevertheless, the court urges the parties to make only as narrowly focused requests as possible to further the disposition of Wachovia's motion for preliminary injunction. If the parties are unable to resolve any differences about the scope

of document requests, they are urged to submit such differences promptly to Chief United States Magistrate Judge Paul A. Zoss.

### III.  CONCLUSION

Although this court has not hesitated to enforce restrictive covenants in employment contracts in appropriate circumstances, *see Interbake Foods, L.L.C. v. Tomasiello*, 461 F. Supp. 2d 943 (N.D. Iowa 2006) (enjoining disclosure of trade secrets, but not former employee's employment with competitor); *Pro Edge, L.P.*, 374 F. Supp. 2d at 711 (enforcing restrictive covenant with preliminary injunction); *Uncle B's Bakery, Inc. v. O'Rourke*, 938 F. Supp. 1450 (N.D. Iowa 1996); *Curtis 1000, Inc. v. Youngblade*, 878 F. Supp. 1224 (N.D. Iowa 1995), each case involving a restrictive covenant turns on its facts.  Here, on the record so far presented, the facts do not warrant the issuance of a temporary restraining order.  Under the circumstances, however, the court does find it appropriate to grant Wachovia's request for expedited discovery to help the parties prepare for a preliminary injunction hearing.

THEREFORE,

1.      Wachovia's July 31, 2008, Motion For A Temporary Restraining Order And Preliminary Injunction And For An Order Permitting Expedited Discovery (docket no. 3) is **granted in part and denied in part**, as follows:

a.      Wachovia's request for a temporary restraining order is **denied**; and

b.      Wachovia's request for expedited discovery in aid of preliminary injunction proceedings before this court is **granted**, with the limits stated above.

2.      The court **reserves ruling** at this time on that part of Wachovia's July 31, 2008, Motion For A Temporary Restraining Order And Preliminary Injunction And For An Order Permitting Expedited Discovery (docket no. 3) seeking a preliminary injunction.

3.     **A hearing** on Wachovia's July 31, 2008, Motion For A Preliminary Injunction (docket no. 3) **is scheduled for 8:30 a.m. on Monday, September 8, 2008,** in the third floor courtroom of the United States Courthouse in Sioux City, Iowa.

**IT IS SO ORDERED.**

**DATED** this 5th day of August, 2008.

_Mark W. Bennett_
_____
MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA